## United States District Court
## Eastern District of Virginia
**Alexandria Division**

| | |
|---|---|
| **PAUL SHAO,** | |
| Plaintiff, | |
| v. | **Civil Action No. 1:23-cv-00809** |
| **ALLSTATE INSURANCE COMPANY,** | |
| Defendant. | |

## <u>AMENDED COMPLAINT AFTER NONSUIT</u>

### INTRODUCTORY ALLEGATIONS

1. The *Agreed Order of Nonsuit* of *Shao v. Allstate* (Case No.: 2021-03802; Civil Action No.: 1:20-cv-00482-AJT-TCB) was entered into the Court by his Honorable Judge Robert J. Smith on November 16, 2022. (Exhibit AA.)

2. Plaintiff Paul Shao ("Shao") is an individual residing in Fairfax County at 9233 Lee Masey Drive, Lorton, Virginia 22079. He owned until May 30, 2020, an Allstate agency in Springfield, Fairfax County since August 1, 2015. His Allstate agency was terminated by Allstate as of September 1, 2020.

3. Defendant Allstate Insurance Company ("Allstate") is an Illinois corporation with a place of business located at 1745 Loch Haven Drive, Roanoke, Virginia 24019.

1

4.  Allstate violated the Allstate R3001 Exclusive Agency Agreement (EA Agreement) it signed with its exclusive agents. They are:

5.  First, a general description of the said agreement. The EA Agreement consists of the main contract ("Main", 12 pages) and accompanying integrated documents, which are as follows: Exclusive Agency Independent Contractor Manual ("Manual," 47 pages, revised 38 times at the time of 4/1/2021), the Supplement for the R3001 Agreement ("Supplement," 264 pages, revised 79 times at the time of 6/1/2021), and Exclusive Agency Independent Contractor Reference Guide ("Guide," 99 pages, revised 13 times at the time of 7/11/2016). The total contract consists of 422 pages and Allstate has the sole power to alter the terms of the contract in the three appended components – in this case, 130 times.

6.  Second, a one-sided/imparity employment contract. The EA Agreement under question is an adhesion-like contract and Its Paragraph I.C of the Main allows Allstate to amend freely the appended components (the rules and regulations of the company) without accommodating the principle of meeting of the minds of the contract law. This "fluid" one-sided nature of the contract should be executed **under the scrutiny of the Federal and State laws which imbue in all contracts the obligation of good faith and fair dealing**.

7.  Third, Allstate allowed the rules and regulations of a company (the 3 appended components) to supplant the main contractual agreement made between the Company and the agent-signee. The three accompanying integrated documents outlined above are normally in the case of other companies described and classified as the rules and regulations of the employing company; thus, an auxiliary/back-seat part of a contract, which should not consist of terms or issues which are major and fundamental to the agreement between the Company

2

and the agent-signee as the meeting of the mind is essential, in the sense **that there is a hierarchy of contractual terms: some have primacy or importance over other terms.** The 12-page agreement is the main contract between Allstate and the agent which consists of 10 pages of text delineating the terms of the contract and 2 pages of an exhibit, which is termed "Appendix A: Confidentiality and Non-Competition Agreement," which made certain the signing agent remains captive and his/her existing office becomes inoperable as an insurance agency.

8. Forth, the terms of the EA Agreement as delineated by Allstate are self-conflicting and inconsistent as shown below:

   a. The agreement is entitled, "Allstate R3001S **Exclusive Agency** Agreement." Immediately, in Paragraph XX.E and XX.F of the Main there are the following statements, "The authority granted to you under this Agreement is nonexclusive (It means the title of the Agreement lies on being "exclusive agency!"). The term 'Exclusive' as used in the title of this Agreement refers to the obligations assumed by agent-signee (but not Allstate!) under Section I.E [of the Main][1]." and "The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement." Does it mean that "the descriptive headings of this agreement" is only front/sheep's clothing to fool the agent-signee of the true intent of the contract? Is the title of the EA Agreement meant to deceive the other party of the contract with ill intent? If so, the EA Agreement was designed with a deceptive intent. Could a deceptive contract be lawful?

   b. The term Business Objectives ("BO") without the name "Allstate" (which became ABO by adding Allstate before BO in the 2013 Manual under Agency Evaluation: Exhibit A.2.a) is stated in the Main (II.B) as follows: "You will meet certain **business objectives** established by the Company in the areas **of profitability, growth, retention, customer satisfaction and customer service.**" Before 2013, OB was mentioned in prior Manuals, e.g., 2012 Manual states under Agency Evaluation as follows, "The key areas that are currently considered in evaluating your agency's results include: • Standard Auto IIF Growth • Allstate Financial (Production Credit) • Agency Loyalty Index • Loss

---

[1] Which states, "You will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker ...."

Ratio/ Profitability (Established Agencies only) • Standard Auto Retention (Start-up Agencies only)." (p. 14.) These conditions somewhat echo the areas listed in the main contract for evaluating the performance of an agent. They are the standards against which Allstate agency should be evaluated, including the mega agency Esurance, which is operated by the Company itself. It should be emphasized that the OB in the Main should have primacy over the ABO in the 2013 Manual under Agency Evaluation, because the former is constant and meets the requirement of meeting of the minds and the latter changes every so often at the wishes or the whims of Allstate without the meeting of the minds.

c. There is no production quota in the Manual prior to 2013, when and only when a vague reference of ABO was put inside the Manual. The requirements were rather vague terms in 2013 and not acted upon in the sense that no notice was sent to agents of this requirement and there was no report of agent being terminated because of ABO. But since April 2019 the quota system was executed with specific details and rigid timeline in an unprecedented blanket manner. It is designed to terminate a vast number of agents. Hundreds of agents became casualty or carnage of this act of Allstate.

d. Furthermore, Allstate violates the nearly 100 years EA tradition of the insurance industry since the Indiana Farm Bureau Insurance[2]. This tradition has been carried on by Nationwide[3] (Shao can testify his own 20 plus years' experience at Nationwide) and State Farm[4]. A potential Nationwide or State Farm agent is employed as an employee-captive agent, who had to meet very tough production quotas to be "graduated" or vested or tenured in 1-3 years to become an independent-captive (IC) agent, a "tenured" agent, with no production quotas to be imposed on him/her. This is the very hallmark of an EA agent as an independent agent. By imposing it, Allstate has nulled the status of an agent being an IC and made him/her an employee-agent.

e. While an agent of Nationwide or State Farm receives commissions from his tenured book, the Company owns both the book and its economic interest, and he/she cannot sell his/her tenure-ship on the book. Therefore, when the contract between captor and captee is terminated, the tenure-ship ceases to exist, and the agent shall cease to receive commission from the Captor on his/her tenured book.

f. In Allstate's case, the agent does purchase a book and owns "something." Allstate made a marriage or cross-breed between the EA and IA (Independent

---

[2] Founded in 1919.

[3] Farm Bureau Mutual, which was found in 1939, changed its name to Nationwide Insurance in 1955.

[4] Founded in June 1922.

Agent) by creating the concept of the **economic interest** of a book of insurance policies (Paragraph XVI.B. of the Main[5]), which is, an agent does not own the policy itself but has an ownership of a percentage/"cut" of the commission received by the Captor-company; and to acquire this ownership of the economic interest the agent pays a sum of money as much as the ownership of the policy itself paid by an IA to acquire the ownership and its economic interest. It is a leasehold interest (in a metaphorical sense) of the commission of a policy, which is as expensive as the ownership of the policy itself. Is this leasehold/economic interest ownership sacred in the sense that it is protected by the Fifth Amendment's takings clause and by the Fourteenth Amendment's due process clause? **Can Allstate forfeit/appropriate/null this sacred ownership at will**? If a contract must be lawful, then the term in the EA agreement must be lawful. It cannot violate the sacred values stated in the Constitution.

g.  The reason why Allstate needs to make contradictory statements about "exclusive agency" in the title of the Agreement is because Allstate wants to avoid paying a Consideration for its EA Offer to signee-agent in a contractual agreement. EA, which stands for exclusive captive agent, means that the agent can only sell Allstate insurance products or Allstate-approved outside products. (I.E of the Main. See Note 1.) In exchange for being exclusive or captive for agents, the employer/captor has the moral obligation to follow the moral principle of reciprocity, or, in the legal context, the doctrine of consideration. To put it in an everyday context, should a spouse who demands faithfulness from his/her partner be faithful himself/herself? In the context of the insurance industry, in exchange for the restriction imposed by the employing/captor company to selling only the brand of the employer, would the employer be required to refrain from opening a super mega agency to sell its products and refrain from distributing to non-captive independent agencies to sell its products, as the obligation of good faith and fair dealing demand of both parties of the contract? **State Farm has religiously observed this commitment, but not Allstate**. (Nationwide had in the past ten years broken this reciprocity promise to its agents by doing direct sales and distributing its brand products to the independent agents; however, it had the decency of recognizing the norm of the captive agent tradition and finally on 7-1-20, Nationwide completed its two-year transition to release its captive agents from the bondage of captivity to become free and independent agents.) Allstate had distributed to non-captive independent agencies to sell its products in 1999, when it first introduced the EA Agreement. Later, it operated a mega agency Esurance to compete with its own EA agents. There is wanton

---

[5] Which states, "You have an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in your Allstate customer accounts developed under this Agreement."

disregard on Allstate's part in the moral obligation of reciprocity or the legal obligation of offer-consideration, one of the four elements of a legal contract.

9. Conclusion:

a. The term "Exclusive" used in the title of the Allstate EA R3001 agreement[6] is only a sheep's clothing to fool the world with deceptive intent and wanton disregard of the principle of reciprocity. The lawfulness of the EA Agreement is under question.

b. TPP (which stands for Termination Payment and which enables Allstate to take an immediate possession of Agent's economic interest of the book of business with a subsequent 12-24 installment payments without interests and with an exclusion of payment of a significant portion of the book which Allstate arbitrarily deems having a birth defect because the policies were written by the employee-agents) is an act of appropriation/forfeiture, not an act of buying out as implied in the term "buy back" used by the Allstate recruiter to the potential buyer of the economic interest of a book of Allstate business. If economic interest is protected by the Constitution, then TPP is unlawful.

c. ABO (Allstate Business Objective) is a production quota, which demarcates and defines an employee-agent from an independent agent – a fact recognized by Allstate when it transformed the entire agency force from former to the latter by eliminating production quotas from 1999 until 2013 for its EA agents. (Exhibit A.2.a.) When Allstate reinstated the ABO requirement in 2013, and executed it relentlessly in April 2019, it had violated the long-standing tradition of EA in the insurance industry as championed by State Farm and, as a result, violated the IRS's principle of "cannot-be-controlled" for an independent contractor. Allstate should have paid since 2019 EAs as employee salesperson all the office expenses and the full benefits of an employee-agent. Could a company in Virginia deny due process to an employee-agent or to an in-name-only independent contractor? Allstate did not offer due process to its agents in executing ABO.

d. The cancellation of the EA Agreement by Allstate unilaterally on its agent does not automatically follow that agent's ownership of the economic interest of the book of business is to be nulled. In fact, the EA's claim of ownership of the economic interest of the policies they have purchased is as good as that of the IA, because they have paid a similar amount of

---

[6] For a survey of the history of how Allstate rolled out its EA R3001 agreement since 1999, see "Revisiting the Desimone Ruling," Submitted Anonymously, in *ExclusiveFocus* (Spring 2011): 42-46.

> market prices based on a multiplier of 1.5 to 2.5 in the industrial standard formular in calculating the value of an agency. There are two legal items: the EA agreement between Allstate and Agent-signee, and agent's ownership of the economic interest of the book of business. Would the termination of the former immediately imply that his/her ownership of the latter is nulled and voided automatically? It is not, because Allstate must utilize TPP to nullify the ownership of the latter. But TPP is appropriation/forfeiture, which is unlawful. The lawful way to null an agent's ownership of economic interest is to buy out or buy back the ownership.

10. Failure to buy out, Allstate should continue to pay the 9% cut of the economic interest of the

    book, which Shao paid the sum of $339,767.91 to acquire and which should be protected by

    the Fifth Amendment's takings clause and by the Fourteenth Amendment's due process

    clause.

## BACKGROUND

11. To provide a road map to the rather long narrative of what had happened, provided below

    is an account of the chain of events:

    a. 11/1/15 Agent Jeff Shi ("Mr. Shi") informed via text message Plaintiff Shao that agent Suzie Xu ("Ms. Xu") had been terminated with cause. (Exhibit E.1; also, Exhibit C.1: Attachment 10, p. 21.)

    b. 11/2-19/2015 Shao expressed sympathy towards Ms. Xu and was willing to buy her book and would employ her as a sub-agent if approved by Allstate. Within a week Allstate launched a big investigation into Shao's sub-agent Brvan Reid ("Mr. Reid"), who was a great life agent in selling funeral life policies and who could help Shao to receive hundreds and thousands of bonus payments from Allstate. Allstate could find no wrongdoings in Mr. Reid. However, Allstate forced out Mr. Reid from Allstate by strong arming Crump/Gerber, owned by Allstate, to revoke their contract with Mr. Reid, who was black.

    c. 11/20/15 Shao was asked to sign a Letter of Understanding without due process. Allstate refused to name the offense, to provide the report of the investigation, and to allow a mediator. (Details of events provided in Shao's 6-11-18 letter to CEO Mr. Wilson, Exhibit C.1, and below.)

d.  5/12/16 Territory Sales Leader Fred Miller ("Mr. Miller") used his authority to derail Shao's agreement with a fellow agent Ms. Primich to transfer a policyholder's commercial policies from agency to hers. (Details of events provided in Shao's 6-11-18 letter to CEO Mr. Wilson, Exhibit C.1, and below.)

e.  10/24 – 11/2016 Shao was at that time in the 30% of all capital region agents and Mr. Miller forced on Shao two WebEx New Agent Performance Reviews, requiring Shao, Cindi Rowan ("Ms. Rowan"), and Tim Beckner ("Mr. Beckner") to attend. Mr. Beckner never attended but Ms. Rowan did. Ms. Rowan, who was black, resigned from Allstate later in December 2016. (Details of events provided in Shao's 6-11-18 letter to CEO Mr. Wilson, Exhibit C.1, and below.)

f.  12-2016 Shao made the Honor Ring and received over a twenty-thousand-dollar bonus in 2017. The absence of Mr. Reid would mean Shao would not make it in 2017. Shao had many roadblocks created by the life underwriters in his writing of life policies. Only with the help of the Field VP London Bradley ("Mr. Bradley"), Shao was able to push through life policies in the Life department. Mr. Bradley, who is black, would instruct his assistant Mia Torrez ("Ms. Torrez"), who is brown, to follow up on the life case for Shao. Ms. Torrez left the Capital Region on 4/16/18 for an Allstate job in California.

g.  1/1/17 Shao has a new sales leader, Ann Smith ("Ms. Smith"), who had set out to remove Shao from Allstate, constantly asking Shao to sell his agency.

h.  5/12/17 Ms. Smith came with Dave Simons ("Mr. Simons") to Shao's office to interview his sub-agent Peggy Ho ("Ms. Ho") to succeed Shao. (Details of events provided in Shao's 6-11-18 letter to CEO Mr. Wilson, Exhibit C.1, and below.)

i.  10/1/17 Jennifer Yingling ("Ms. Yingling") replaced Mr. Miller as Shao's Territory Sales Leader.

j.  10-2017 Ms. Yingling had invited all the heads of other departments such as claims, underwritings, life insurance and marketing to her first sales meeting. After that meeting, Shao felt the squeezes from the claims, the underwritings, and the marketing department. (Detail account provided in Shao's 9-3-19 email to Ms. Smith, which is an attachment to Shao's same day letter to Mr. Wilson, Exhibit C.2, and below.)

k. 3 to 6-2018 Shao's term life insurance lapsed because he left his payment check in the car. He requested reinstatement but failed. This event caused him to write to CEO Tom Wilson ("Mr. Wilson") for the first time because Ms. Torrez was about to leave for California and Mr. Bradley was promoted to Senior Field VP of the Southeast Region, effective May 31, 2018. (Details of events provided in Shao's 6-11-18 letter to CEO Mr. Wilson, Exhibit C.1, and below.)

l. 6-?018 Shao's life insurance was reinstated within 10 days after his letter to Mr. Wilson. And many wrongdoings Shao alleged in the letter were corrected in the two weeks after his letter. Shao had some peace and quiet for half a year to nurse his sleep apnea ailment, which was diagnosed in 2017. *Id*.

m. 12-2018 Ms. Smith restarted her effort to ask Shao to sell my agency. (Detail account provided in Shao's 9-3-19 email to Ms. Smith, which is an attachment to Shao's same day letter to Mr. Wilson, Exhibit C.2, and below.)

n. 1/4/2019 Ms. Smith arranged a meeting with a potential buyer Maurice Springer ("Mr. Springer") at Shao's office and sending to him and his banker Mr. Ed Lull all Shao's financial statements of four years without a letter of intent from Mr. Springer, who acted as though he was already the owner of Shao's agency. Shao's assistant Maggie Wang ("Ms. Wang") sensed something went wrong, feeling unsecured and she quitted. Ms. Smith knew Shao had sleep apnea which had a decapitated effect on a patient's ability to work consistently. She planned her scheme to drive out Ms. Wang, who was the only help Shao had in insurance production. And Ms. Smith knew Allstate had a production quota coming in 2019. *Id.*

o. 4-2019 The production quota ABO (Allstate Business Objectives) was executed.

p. 2-2020 Shao did not meet the ABO quota and was served the notice of termination to be terminated on 5/30/20.

q. 3/16/20 Shao asked for an extension of termination for two months because of the Covid-19 pandemic through Ms. Smith and was denied by the Headquarter. Ms. Smith, however, told him that he could receive three months' extension if he could produce eligible buyers for his agency. (Exhibit D.1.)

r. 3/25/20 Shao wrote again to Mr. Wilson for an extension of termination for two months. He received no response. (Exhibit C.3.)

s.  4/29/20 Shao submitted a signed letter of intent to purchase the agency by
    Ms. Catherine Lee.

t.  5/4/20 Shao wrote to Mr. Wilson again, begging for an extension, since he
    had found a legitimate buyer, Ms. Lee. (Exhibit C.3.) As a result of this letter,
    he finally received his extension notice from Ms. Frusco/Yingling on
    5/15/20 to have a new termination day of 8/31/20. (Exhibit C.4.)

u.  5/28/20 Shao, however, had to close his office because he had made a deal
    with his landlord to terminate his lease at the end of May.

12. To facilitate an easier reading of the narrative, provided is the chain of command in the

Allstate Capital Region of Sales:

Field Senior VP: Bob Becker ("Mr. Becker").

Regional Sales Leader: Dave Simons ("Mr. Simons").

Territorial Sales Leader: Fred Miller ("Mr. Miller"), who was replaced by Jennifer
    Yingling (Ms. Yingling") on 10/1/2017.

Field Sales Leader: Cindi Rowan ("Ms. Rowan"), who was replaced by Ann Smith
    ("Ms. Smith") on 1/1/2017. There was many other Field Sales Leaders. For
    example, Toni Shaner ("Ms. Shaner") was the leader for agent Mr. Shi and
    Duane Crupper ("Mr. Crupper") was the leader for Agent Ms. Xu.

New Agent Sales Leader: Tim Beckner ("Mr. Beckner"), who worked with Ms.
    Rowan to acclimatize Shao to the working environment of Allstate for the
    first 9 months of joining the company,

Field Vice President: London Bradley ("Mr. Bradley"), who was directly under Mr.
    Becker but had no administrative power over Mr. Simons. However, due
    to his lofty position he was able to assist Shao in pushing through many life
    applications.

13. Toni Shaner ("Ms. Shaner"), as an Allstate sales leader and recruiter and employee of

Allstate, had attempted to recruit Plaintiff Shao in April 2015 so that she could receive a

recruiter commission, emphasizing the ongoing Trusted Advisor program as the future of

Allstate. Plaintiff had been a 20-year Nationwide Insurance agent from 1991 to 2011 with a

10

proven sales record of building from scratch up to $2.6 million premiums in his first four

years with Nationwide Insurance company and of attaining the Chairman Conference in

1994. Shao was given the offer of purchasing a small agency of less than $1.5 million of

book value with 50-100 thousand dollars down and a loan of the balance from Allstate.

Shao was then 68 years old and had expressed some reservations as to his ability to survive

as an agent-owner with Allstate. Ms. Shaner assured Shao that, if he could perform well in

the first year, it should be easy-going for him down the road. She further assured Shao that

Allstate would **buy back** the insurance book from him at the multiplier of 1.5 (the function

of which will be explained later) in calculation of the value of the book so that Shao would

not have lost all he had invested, if his agency were to be terminated.

14. The standard way of calculating the value (thus the price) of an insurance agency (which

Allstate adopts[7]) is as follows: total annual premium received x 10% (commission Allstate

pays to agent) x a multiplier in the range of 2 to 2.5, which is determined by the retention,

the loss ratio and ability to sell life insurance, etc. For example, an agency of $1 million

annual premium with mediocre performance may be valued at: $1,000,000 x .1

---

[7] In the 04/26/21 *Answer and Affirmative Defenses*, Allstate's counsel Mr. Humphrey flatly denied that a "a 'standard way of calculating the value (thus the price) of an Allstate agency' exists." (P. 4.) Allstate's counsel Mr. Marfut in the 08/26/22 asked Shao to "[i]dentify in detail how, from whom (...), and when you learned 'the standard way of calc⟨ lating the value (...) of an Allstate agency."

Shao's answer is: "In Allstate's agency computer platform Gateway, there was a platform page which taught agents how to evaluate the market value of Allstate Books of Business. The formula was there. The page was available in 2015, when I wanted to buy an agency and available in 2019, when I wanted to sell mine. I was first shown by a prospective seller (whose name I cannot recall right now), with whom I had an interview and who was introduced to me by Toni Shaner, who served both as an administrator and as an agent in marketing agencies. She had said that I could have reviewed the Gateway info on market value of agencies with agent Jeff Shi, who introduced me to Toni. I would say that Allstate had set the standard for calculating the value of an agency.

Furthermore, the Formula is universal in the sense that everyone in the industry uses the formula to calculate the value of a book of insurance policies. I knew the formula long before my association with Allstate. When one says multiplier x, one refers to this formula. Allstate use multiplier 1.5 for TPP (Termination Payment)."

(commission) x 2 (multiplier) = $200,000. Shao purchased an agency from the former owner, Brent Elliot ("Mr. Elliot") of Washington Associates, Inc., having a book of $1.8 million, a portion of which consisting of $1,445,906 (consisting of $1,413,697 personal lines and $32,209 commercial lines) was sold to Shao for the price of $339,767.91 (= $1,445,906 x .1 x 2.35), which was paid with a loan of $250,000 from Allstate and $89,787.91 down payment from Plaintiff. In addition, Allstate also served as an arbitrator in finalizing the transaction between Shao and Mr. Elliot on August 4, 2015. Mr. Elliot produced a total of 68 personal lines policies in the 12 months prior to the settlement date of 8-1-2015. This fact eased Shao's mind in the sense that he felt he could have done as Mr. Elliot did, if Shao's old age hindered him from carrying on the business in the future.

15. Four months after joining Allstate, Ms. Shaner and Shao had Christmas dinner at Asian Grill restaurant in West Springfield. She informed Plaintiff that he did well and encouraged him to achieve Honor Ring in the year 2016 to receive a substantial bonus and to enable him to purchase a second agency, just as she said, after reviewing plaintiff's business proposal, in her 6-30-2015 email, which stated "I am glad to hear that you have outlined the activities to exceed Tier I goals each month. Successful implementation will help you grow your business and prepare for your second location." Shao did achieve Honor Ring in 2016 and received over a twenty-thousand-dollar bonus in 2017. Be that as it may, what lay ahead was not prosperity but nightmare.

16. The person who introduced Shao to join Allstate was the star Agent Jeff Shi, who is the son of Shao's good friend Jason Shi and whom Shao had urged to join Allstate 12 years ago. Jeff sent Shao a text message on 11/1/2015, stating, "You should ask Toni [Shaner, field leader

of Jeff] about Suzie [Xu] She just get terminated by Allstate because her husband was selling with out a license But her book is a lot of Chinese clients and you can probably buy it." (Exhibit E.1; also, Exhibit C.1: Attachment 10, p. 21.) Shao thus contacted Suzie and met with her. Shao was told that Suzie had worked for Allstate as a sub-agent for about 6 years with outstanding performance and then became a new agent-owner in 2015. According to Suzie, her husband did pass the test and had a license, but he did something which had violated Allstate rules and regulations. Shao said he would have been happy to buy her book if she would promise Shao not to solicit those customers, she had sold him, after she left Allstate. She gave Shao her words. She also asked whether Shao would take her in as his employee if she could persuade Allstate to reverse her termination. Shao said he would. She asked Shao what usually would get a person terminated in the insurance industry. Shao said that if she violated the state law, stole money, and channeled Allstate policies to other insurers. She said her husband's offense was not those. Shao then asked her to check with her field leader Duane Crupper ("Mr. Crupper") on how serious her offenses were. She said that Duane said the punishment metered on her was too harsh for her offenses. She also said the Territorial Sales Leader Mr. Miller, who delivered the termination notice, had emphasized that it was not his decision to terminate her, and he was not consulted on the termination decision. This meant that the decision was made by his superior, the regional sales leader Mr. Simons.

17. If what Ms. Xu said were true, then it seemed to Shao that she had not committed an offense which was serious enough to warrant an immediate and automatic termination. Shao advised her to appeal her termination through the proper channel; despite everything,

she had put in 6-7 years very dedicated working life to Allstate. But Shao was completely ignorant of how Allstate functioned. Up until today Shao didn't know whether Allstate has an institutional channel for an agent to bring forth an appeal for a grievance, which may be genuine or imagined. Shao's support for her brought immediate retaliation to him from the administration. Shao came to gradually realize, rightly or wrongly, that Allstate was run like a police state. In the following narrative, more facts will be provided for such a characterization.

18. Shao purchased the agency from Mr. Elliott without bargaining down the asking price largely because he had a life producer called Bryan Reid ("Mr. Reid'), who could produce every month a couple of funeral life policies at Gerber, a subsidiary of Crump Life, which Allstate owned. Mr. Elliott said that he had had Mr. Reid as an employee salesperson for about a year or so and Shao met with Mr. Reid twice before his purchase of Mr. Elliott's agency. After Shao took over the agency, Mr. Reid produced 7-8 policies in 3 months. Within two and half a week from the date Shao met with Suzie, someone in the administration came out to dismantle his employment of Mr. Reid and destroy his agency's life production; in addition, Shao was forced to sign a Letter of Understanding without providing any evidence and giving a chance to defend himself. Shao felt deeply humiliated.

19. Mr. Reid has a customer Dr. Pedro Beccerra-Cely, who was the care giver of Arcelia Riddick, Jamie Knight, Ernest Arrington and Frank Haskell, and who had bought funeral life for each of them with him as owner and beneficiary for each insured named above a face amount of $15,000, $15,000, $10,000 and $10,000, respectively. (Original attachment: Doc. 11, pp. 28-31; the delivery receipt lists former agent-owner, Mr. Elliott, as the agent for an app taken

14

on 8/13/2015, p. 22.) On the surface it looked quite sleazy -- a medical provider took advantage of his patients. Was this legal and ethical? Allstate started a big investigation into Dr. Beccerra-Cely, into Mr. Reid and into Mr. Elliott as well as into Shao. Shao was told by his New Agent Sales Leader Tim Beckner ("Mr. Beckner"), who had been with Allstate for more than 30 years) that he had never seen an investigation of such a magnitude. The result was anticlimactic. It was legal as far as the State was concerned and perhaps ethical, depending on one's understanding of the matter. From Mr. Reid and Mr. Elliott, Shao's understanding was that the insureds had at least the psychological needs of feeling that they were being taken care of their last rite and, if Dr. Beccerra- Cely gave them a passable funeral, it would save the State some money. Shao had attempted to explain to Mr. Beckner these viewpoints. Shao's immediate leader Ms. Rowan told him that Allstate had succeeded in strong- arming Crump/Gerber to stop issuing the four policies in question and she said that there was initial resistance from Crump/Gerber, but finally they had succumbed to Allstate's pressure. At the start of the investigation Allstate had unemployed Brian from his Allstate employment and was, after the investigation of not finding any wrong doings, not going to reemploy him. Worst of all, Allstate had forced Crump/Gerber to revoke their contract with Mr. Reid - he was cut off by them "without cause," as he was told by Crump/Gerber. Mr. Reid was very bitter that Allstate would do such a thing. (Exhibit c.1, Attachment #11 (10 pages), pp. 22-31.)

20. Next was Shao's turn to be disciplined. He was asked to sign a Letter of Understanding for Mr. Reid's misbehavior, which was not specified or named; therefore, there was no specific deed of misbehavior spelled out in the Letter. Shao asked to have a couple days so that he

could consult an attorney, who thought it was a bit strange that, if Mr. Reid did not commit

any inappropriate act which could be spelled out clearly in writing and if Shao's

appointment of him went through the prescribed procedures of Allstate as Mr. Elliott had

done, Shao was asked to acknowledge having not supervised Mr. Reid well. However, in the

attorney's view, for practical reason Shao might consider signing the Letter, because, even if

no action might have been taken by Allstate for not signing, Shao would be crippled in

carrying on the tasks of an agent in the future. He suggested that Shao went to a mediation

department of Allstate to get a clarification of the offenses he had committed. Shao asked

Mr. Beckner whether there was an ombudsman he could approach to appeal his case

(Exhibit c.1, Attachment #12 (5 pages): p. 34.) since he did not know the existence of

ombudsman or the like in Allstate. Shao wrote to him and asked for the findings and the

report of the investigation. (Exhibit c.1, Attachment #12 (5 pages), pp. 35-36.) Shao did not

receive the report.

21. Shao first on 11/20/2015 signed the Letter by crossing out the statement, which stated, "I

was advised that an investigation was conducted into the sales activities of one of my

employees and that the findings of the investigation concluded that there was a lack of

supervision provided by me over my agency staff. In addition, the inappropriate actions of

my employee were in direct violation of my independent Contractor Agreement." (Exhibit

c.1, Attachment # 12(5 pages), p. 32.) Then Shao signed on 11/22/2015 with this statement

in the Letter (Exhibit c.1, Attachment # 12(5 pages), p. 33.) with the hope that he could get

on with his work as an agent without impediments from the administration. That proved to

be naive and wishful thinking. Shao was pressed to sell his agency.

22. In 2017 Plaintiff had a new supervisor Ann Smith ("Ms. Smith"), who liked to play the role of
a recruiter of new agents so that she could receive a commission of up to $10,000 – Allstate
had just raised the referral fee commission from $5,000 to $10,000 in 2017. She had
suggested since 5-2017 to Shao to sell his agency. For example, on 5/12/2017 Ms. Smith
came with Dave Simons ("Mr. Simons"), who was the top/supreme manager/sales leader in
the Capital Region, to my office to interview my sub-agent Peggy Ho, whose mother Amy Ho
("Ms. Ho") had expressed an interest in buying my agency, to succeed me. (Exhibit c.1,
Attachment #1, p. 1.) Ms. Smith formally wrote an email to Shao on 10/06/2017, stating,
"Paul, would you consider selling in January if there was a solid buyer ready?" Shao replied
to on the same day, saying firmly, "Ann, I shall stay on with Allstate for at least another two
years." It was a clear statement, which expressed Shao's intention to stay with Allstate until
at least October 6, 2019, and, yet, on 12/13/ 2018 Ms. Smith pressed the issue of selling his
agency by recommending a "highly qualified candidate" of agency-buyer, Maurice Springer
("Mr. Springer"), for Shao to meet. Ms. Smith, Mr. Springer, and Shao met in Shao's office in
the afternoon of 1-4-2019. Customarily, a buyer will receive at the first meeting a copy of
the business metrics, which details the size of the book, retention, and loss ratio. However,
Ms. Smith in the meeting sent to Mr. Springer and his banker Ed Lull all his four years'
financial statements without receiving a signed letter of intent, a down payment, and a
prequalification from Mr. Springer. She also presented to Shao the statement of
termination payment of Shao's agency and described in the presence of Mr. Springer to
Shao in a lurid manner how Allstate could reduce in various ways the payments to the
terminated agent to leave him penniless. Mr. Springer acted as though he had already been

17

the owner of Shao's agency and inspected the office in exceptional detail to the point of suggesting changes to the layout of the office. Shao's assistant Maggie Linxia Wang ("Ms. Wang") sensed something was wrong. She felt insecure and resigned from her employment. She left the agency at the end of January 2019.

23. Shao spent 5 months coaching Ms. Wang at the start of his agency in 2015 for her to obtain a Property and Casualty license and took her around his community to get to know his old customers. She was a very capable agent and was able to run his agency starting early 2016. At the end of 2017, Shao was diagnosed with sleep apnea, which meant feeling tired during the daytime, even after a full night of sleep. The loss of Ms. Wang meant that Shao would not be able to grow his agency, since Shao lacked the energy to train another assistant to help Shao run it. At the time (11-2018) Shao's book of premium was $1,530,114, which was $116,417 more than the book of $1,413,697 he purchased in 8-2015. Usually, an agency loses 10% of the premium due to normal drops of policies. Accordingly, the first year would be reduced to $1,272,327, the second $1,145,094 and the third $1,030,585 with a total reduction of $499,528 in three years. Therefore, Shao had a "growth ($499,528 + $116,417 = $615,945)" of 43.5% (=$615,945/$1,413,697x100; average 14.5% per year) in the three years from 2015 to 2018. This bad faith act of bringing Shao a buyer by Ms. Smith resulted in the resignation of Ms. Wang and thus put his agency on the road to decline.

24. When Shao joined Allstate in 2015, he was 69 years old. He knew his working years were quite limited and he only planned to do it for a period of 4-5 years. When he found out the sub-agent Ms. Wang was a capable insurance agent, he arranged her an appointment with the sales leader Ms. Rowan in 2016 to discuss her chance of succeeding him in the future

when he retired. Ms. Rowan outlined to Ms. Wang the requirements for a successor to an agency. Ms. Wang was good, but she had deficiency in her English language. Shao discussed it with his good friend Amy Ho, who was a successful accountant. She said her daughter Peggy might be a good partner to Ms. Wang in succeeding the agency. Shao informed Ms. Smith in May 2017 of the situation and asked her to interview Peggy and Amy. What Shao did not expect was that Ms. Smith would bring Mr. Simons to the meeting.[8]

25. In October 2017 Shao had a new Territorial Sales Leader Jennifer Yingling ("Ms. Yingling"), who had invited all the heads of other departments such as claims, underwritings, life insurance and marketing to her first sales meeting. After that meeting, Shao felt the squeezes from the claims, the underwritings, and the marketing department.

26. Shao had encountered some hardships with property and casualty underwritings, which was called "RMBC" at Allstate. For example, a policyholder Barbara Ryan (Pol. #: 952191386) called to complain about her coverage ($859,000, before April 2018) was way above the county assessment ($284,590 Building, 2017). I called RMBC to send an inspector to evaluate the value of the house and was told to submit the county assessment, and Estimator evaluation, which at the time the Total Living Area is 3381 sf, and the Replacement Cost is $752,749. Shao sent in the requested documents three times and finally it did modify the Total Living Area to 3044 sf as shown in the assessment, but the Replacement Cost remains the same $752,749. Shao could only change coverage from $859,000 to $748,352 to pacify the policyholder. (Exhibit c.1, Attachment # 16(3 pages), pp.

---

[8] Apparently, Ms. Smith was impressed with Peggy and Amy. Another surprise was that Ms. Smith called Shao several days later, asking whether she could take Peggy out of his agency as a successor and had her as a buyer for other agencies.

49-51.) Shao's office landlord David Beale ("Mr. Beale") has many cars (14 cars) and, after two years of persuasion, he agreed to let Shao's agency give him a quote in October 2017, which Shao did; but Shao could not overcome the hurdle of rejection from RMBC. But Shao's good friend, star agent Shi, was able to persuade RMBC to let him insure Mr. Beale's 14 cars. (Exhibit c.1, Attachment # 17(3 pages), pp. 52-54.) Within a month of Shao's letter to Mr. Wilson, RMBC would not make exceptions to any agents including star agents.

27. Shao tried to recruit a sub-agent through the Allstate recruitment center. He received 12 candidates from Kimberly Ickes in July-August 2017. (Exhibit c.1, Attachment #4, p. 4.) Among the 12, three interested Shao. However, after Mr. Yingling's sales meeting, Shao received none from Charles Wooten ("Mr. Wooten") during the entire period he worked with him. Shao did complain to the Sales Leader Ms. Smith. And finally, on March 6, Mr. Wooten sent Shao an unqualified candidate of telemarketer (which Shao had never requested) Shacoya Jenkins (whose IdealTrails assessment results are "inconsistent" and whose problem-solving results are "4/15," which means, "Needs help with problem solving" - in short, Ms. Jenkins is not a qualified candidate). (Exhibit c.1, Attachment #5 (3 pages), pp. 5-7.) Furthermore, the resume of Shacoya Jenkins, which Charles attached to his email could not be opened. Mr. Wooten was fired within a week of Shao's letter to Mr. Wilson. No other manager was disciplined by the Region.

28. It is Shao's understanding that any Allstate administrative personnel must make an appointment with an agent to visit his/her office. However, during the period of 3/12(?) to 4/20/2018 Shao had 6 visits from 3 different persons from NCT (National Catastrophe Team). They are:

Kaiten Ladner ("Ms. Ladner") on 3/12/2018 (?).

Michelle Hastings ("Ms. Hastings") on 3/19/2018

Roger Howard ("Mr. Howard") on 3/26, 3/29, 4/10, 4/20

Mr. Howard stopped his visit, after I wrote to him and cc-ed to his supervisor Jeremy Sawyers. (Exhibit c.1, Attachment #9 (3 pages), pp. 18-20.) Ms. Ladner and Ms. Hastings did not show up in my office unannounced, after Shao's letter to Mr. Wilson.

29. The Life Underwriter department: specifically, underwriter Kia Vassar ("Ms. Vassar"), violated in 2018 the Allstate guidelines in reinstating Shao's term life policy (#: 06T1046908) by asking unnecessary documents, forestalling the process by not responding to Shao's correspondences, harassing Shao for asking documents she already had. Shao was in excellent health at the time under no medication and no medical treatment. The only ailment Shao had was sleep-apnea, which was diagnosed in 2017 by Dr. P. Reddy of the Virginia Hospital Center. However, sleep apnea was not a health condition to be a hazardous concern for life underwriting. The term life lapsed due to nonpayment because Shao left the mail containing the premium check in his car without sending. Shao submitted his reinstatement application around 3/8/2018 (Exhibit c.1, Attachment#6 (4 pages), pp. 8-11.).

30. In the app Shao stated clearly that he had in January 2018 a physical with Dr. Y. Soriano and a sleep apnea study with Dr. P. Reddy of the Virginia Hospital Center. (Exhibit c.1, Attachment#6 (4 pages), p. 9.) Shao was recommended to use a C-PAP device. Underwriter Ms. Vassar wrote to Shao on 3/26 asking for the info of his former Doctor, Dr. L. P. Chang, who had been his physician for the past 20 years. Shao provided her with the info. (Exhibit

c.1, Attachment#7 (2 pages), p. 13.) On 4/6 Shao wrote to her, stating his original life policy was issued in January 2016 and in it there was Shao's physical record of Dr. L. P. Chang. (Exhibit c.1, Attachment#7 (2 pages), p. 12.) From January 2016 to January 2018, Shao had not seen Dr. Chang at all, and he was the one who referred Shao to the Virginia Hospital Center. Ms. Vassar wrote back that she wanted to get the sleep study and wanted to know whether Dr. Reddy "currently manage the sleep apnea." All the info on sleep apnea was given in the app Shao submitted on 3/8 and the Allstate life insurance processing platform, *accessallstate.com*, indicated that on 3/26 "requirement received" on "#Was sleep study completed?" (*Ibid*.) It is extremely odd that she said that she needed Dr. Chang's report on 3/26 to decide and then turned around on 4/6, 12 days later, said that she "trying to obtain a copy of the sleep study." Shao pointed out to her that on the platform *accessalstate.com* to track the progress of life app clearly states, "Was sleep study completed?' REQUIREMENTS RECEIVED." (*Ibid*, i.e., She had the report on 3/26 from the system and she asked me for the report on 4/6.) She did not respond. Since 4/6 Shao received not a word from her. However, more than a month later, on 5/14 Shao was notified by his credit card company that the premium he used to reinstate his life policy had been credited back to his account. Shao asked the Sales Leader Ms. Smith whether she could find out the reason for rejection of reinstatement, because Shao had received no notice or explanation from Ms. Vassar or Allstate on the reason for rejection. Ms. Smith agreed to do so and wrote back to him on 5/17, saying, "Paul can you get her what she needs? If so I will ask her to reopen." (Exhibit c.1, Attachment#8 (4 pages), p. 15.) Ms. Vassar wanted Shao to send her via Ms. Smith a copy of the sleep study (which was in her possession on 3/26 through the system)

22

and she promised Ms. Smith she would "reopen and continue underwriting upon receipt of

the" sleep study. (*Ibid*.) Shao forwarded to Ms. Smith the sleep study on the same day 5/17

and up until the time (when Shao wrote to Mr. Wilson on 6/11/18) four weeks later Ms.

Vassar had not re-opened the case as she had promised. (Exhibit c.1, Attachment#8 (4

pages), p. 14.).

31. Four days after Shao's letter to Mr. Wilson, he received an email on 6/15/18 from the

Senior VP Bob Becker, who stated, "I have asked Rob (Robert Hopkins, Regional Financial

Leader, "Mr. Hopkins") to follow up with you concerning the issue of reinstatement of your

policy." Mr. Hopkins contacted via phone that afternoon Ms. Vassar to no avail. Finally, Mr.

Hopkins had the Chief Underwriter of Life Underwriting Rick Bosworth ("Mr. Bosworth")

connected with Shao on Monday the 18th at 4:45 p.m. and the reinstatement of Shao's life

insurance sailed through like a breeze. After the final step in the reinstatement process,

Shao wrote three days later, on the 22nd, to thank Mr. Bosworth for his help. One note may

be added. On the same day Shao wrote to Mr. Wilson, he also sought help from Mr.

Bradley, who had been promoted to head the Southeast Region as the Field Senior VP

effective 5/31/18, on the reinstatement of his life policy as he always did in the past. Mr.

Bradley replied, "Paul …… I am looping RFSL Robert Hopkins into your concern below……"

He did not receive any assistance from Mr. Hopkins, then, but an admonition from Ms.

Smith, who wrote, "FYI – London is no longer part of our Region. If you have concerns,

please follow up with me in the future. If you are not satisfied with my follow up, feel free

to reach out to Jennifer Yingling who is my sales leader." He had follow-up with Ms. Smith

on the life reinstatement matter for two months without any result as detailed above.

32. For a period of half a year after his letter to Mr. Wilson, Shao had enjoyed some peace and quiet at work. He had great improvements from his sleep apnea ailment through meditation, regular exercises, and the change of diets. He had been on the way to a recovery of some sort. On some nights he registered 0% sleep apnea on C-PAP. He lost close to ten pounds and had started enjoying life again. Ms. Smith's 12/13/2017 email of meeting potential buyer Mr. Springer struck a deep fear in Shao. He feared that, if he said NO to Ms. Smith like last time in October 2017, she would create a similar hostile working environment for him and such an environment would wipe out all the progress he had made in the past six months. The 1/4/19 afternoon meeting, detailed under Paragraph 22 above, was brutal. That was the only word to describe it. A harsher working environment awaited ahead to set roadblocks to impede his works and to prevent him from nurturing his sleep apnea wounds he gradually managed to heal in the previous six months.

33. Shao detailed the brutally hostile working environment in his 5 plus pages email to Ms. Smith on 9/3/19 with 36 pages of supporting documentation. The brutally hostile working environment had an adverse effect on his health, Shao had decided to write to Mr. Wilson again. Shao's 2nd letter to Mr. Wilson is very short. The letter's first attachment, which was his email to Ms. Smith — the email and letter were sent on the same day. The content of the email was also meant for Mr. Wilson's ears.

34. In the 9/3/19 letter, Shao thanked Mr. Wilson for his help in reinstating his life policy, in stopping the claim people from visiting his office without first making an appointment, and in his ability to write P&C policies on the level plane as the other agents did. He also expressed his concerns over the disassociation of the Regional financial Leader Mr. Hopkins

and the Chief Underwriter of Life Underwriting Mr. Bosworth from Allstate, who had
assisted him in life reinstatement; as well as the Field Sales Leader Mr. Crupper, who was
the terminated agent Ms. Xu's immediate supervisor and who expressed the view that she
had been punished too harshly. The point Shao wanted to make to Mr. Wilson was that he
had dealt with the symptoms of wrong doings done to Shao but not the root cause of how
the hostile working environment was created. In Shao's email to Ms. Smith this viewpoint
was expressed more directly: the Life Underwriter Ms. Vassar who had violated the
standard procedure of life underwriting was not punished and the Agent Ms. Xu, who
admitted violating the Allstate rules and regulations, pleaded for leniency was not
addressed – Shao asked, "Could we call what has happened here the rule of law, when one
set of members is above the law and the other below?" (Exhibit C.2: 9/3/19 email to Ms.
Smith as same letter to Mr. Wilson, page 5 of 8 of the email.)

35. Mr. Wilson, in his grand restructure plan of 2020, did fire the Field Senior VP Mr. Becker and
the Field Sales Leader Ms. Smith at the year's end of 2020. It was much too late for Shao to
salvage his agency and to regain his health. What Shao called "an Iago-like force" had
prevailed in the Capital Region headed by Mr. Becker. And Mr. Wilson, not unlike Hamlet,
was slow to act.

36. In January 2019 Allstate announced a termination program called "Agency Business
Objectives (ABO)," which would start 4-1-2019 and stipulated two points, 1. "Minimum
production goals will increase from four to six standard items per month (excludes add
items)" and 2. "The threshold for not achieving minimal guidelines will decrease from 10 to
eight months." It also mentioned that this ABO program had been launched since 1-1-2013.

The fact of the matter is, according to agents and ex-agents in the Facebook platform All Agents Page, which has a membership of 2,500, this program was put in place in 2013 but had never been executed. Nevertheless, it was meticulously executed this time in 2019 and hundreds of agents had been ABO'ed since 4-2019. And Shao was one of those being ABO'ed. Once ABO'ed, Allstate would, if an agency were terminated, pay the agency owner what is called a Termination Payment (TPP), which it is contractually obligated to pay, and which would utilize a multiplier, explained above in paragraph 14. For TPP, Allstate would use a much lower multiplier of 1.5 vs. 2.35, the multiplier used when Shao purchased the book.

37. It is pointed out above in 11.b that ABO/production quota is not a condition given in the main agreement and was sneaked into the rules and regulations Manual in 2013 and was changed into stricter rules in January 2019 and executed with vigor in 4/1/2019. ABO violates the nearly 100 years EV tradition of the insurance industry, which has been upheld by Nationwide and State Farm. In paragraph 12.c above it is pointed out that Allstate knew for 14 years that ABO distinguished an independent agent from an employee-agent when it transformed the entire sales force from the latter to the former. By imposing ABO on its agents in April 2019, Allstate has transformed the entire sales force from the former to the latter, i.e., employee-agents.

38. Around 2-20-2020, Ms. Smith delivered to Shao a Termination letter, dated 2-10-20, signed by her supervisor, Ms. Jennifer Frusco/Yingling ("Ms. Frusco/Yingling"). She explained to Shao the content of the letter, informing Shao that he would be terminated on 5-30-2020. She showed Shao, on the Allstate computer platform Gateway, the spreadsheet of TPP Summary,

which showed the TPP amount he would receive from Allstate after the date of termination. She said she would send a copy of a 5-30-2020 statement. When Shao looked at the spreadsheet, he found one problem: at the time Shao's book was of the size $1,418,679 and, under the new formula, he should have received 1.5 x .09 x $1,418,679 = $191,521 from Allstate. But a premium sum of $414,028 was excluded from $1,418,679 to be used to calculate the payment figure. Thus, only $1,004,651 had been used for the calculation of the TPP payment, which resulted in the payment figure of $135,487[9]. Shao asked Ms. Smith for an explanation but she never provided an answer. He requested a written explanation from her, but she never provided it.

39. On or around 3-23-2020 Shao called Ms. Smith, asking whether the termination could be postponed for two months due to the sudden outbreak of Covid-19, which inspired fear and horror to Shao, who was at the vulnerable age of 73, from all the rumors and news about the disease at that time. She said that, just that morning, words from the central administration at Allstate's Chicago headquarters was that no postponement for termination would be granted. With deep fear and horror in his heart Shao wrote on 5-25-2020 to Allstate CEO, Tom Wilson ("Mr. Wilson"), saying, "The oozing of the milk of human kindness during this crisis of the out bursting of Covid-19 is remarkable […]. I wonder whether Allstate would extend the deadline day of termination two more months for agents who had received the notice this year." Shao received no reply from Mr. Wilson.

---

[9] This is the figure shown on Mar-2020 Termination Payment (TPP) – Summary Report. If using the formula, the sum should be: ($135,627.96= $1,004,651.53 x 9% x 1.5 multiplier), which is $140.56 (= $135,627.96 - $135,487.40) more. For the sake of convenience, the printed figure $135,487.40 will be adopted.

40. In Virginia, Governor Ralph Northam issued a stay-at-home order, which took effect on 3/30/20, and expired on 6/10/20, in response to the White House 3/13/20 declaration that a state of national emergency ensued in the United States. The order directed all individuals in Virginia to stay at their place of residence, with exceptions for essential activities such as obtaining food or medical care, exercising outdoors, and traveling to and from essential businesses. Shao's request of postponement of termination was natural and reasonable in view of the Governor's order.

41. The termination of an independent agent was different from that of an employee, who could stay at home once terminated. But the IC had rents to pay, multiple bills such as internet, telephone, etc. to pay. 73-year-old Shao had to run around town to meet with many people such as his landlord, the cleaners, the technicians, and the movers to close his office. Clearly Shao was going against the United States Government's advice of protecting yourself and others from COVID-19 by contacting others of real human beings to putting everyone's lives at risk. It was forced upon Shao by Allstate.

42. Ms. Smith told Shao that, if he had a legitimate buyer for his agency, he could have a three-month extension. Shao started talking to friends about the sale of his agency. A friend of his, Catherine Lee ("Ms. Lee"), expressed an interest and submitted on 4-29-2020 a signed letter of intent. She went through an extensive vetting procedure of Allstate by submitting bank account statements, consenting to background check, etc. Shao, terrified by the unknown disease of Covid-19, wrote on 5-4-2020 to Mr. Wilson again, begging for an extension, since he had found a legitimate buyer. (Exhibit C.3.) As a result of this letter, he finally received his

extension notice from Ms. Frusco/Yingling on 5/15/2020 to have a new termination day of 8/31/2020.

43. Ms. Lee, however, did not move ahead with the purchase, because she was unhappy at the way she had been vetted. Another outside buyer, Amy Ho, was also unable to qualify to purchase the agency. Around early July, Shao approached an Allstate agency owner, Ahmed Taha ("Mr. Taha"), whose office was about 3 miles from his office, to see whether he would be interested in acquiring his book of business. He told Shao that he was interested but was not permitted by Allstate to make the acquisition. His Sales Leader was Ms. Shaner. Shao realized that he was at the end of the road to acquiring a buyer for his agency.

44. On 3-19-2020, Shao received an email from Brandon Hokanson ("Mr. Hokanson") of Allstate Finance Company, an affiliate or subsidiary of Allstate, from which he received a loan in the sum of $250,000 with an interest rate of 6.6% and a term of 10 years, starting 8-1-2015, in order to purchase the agency. The monthly payment of the loan is $2,851.44. In his follow-up email on the same day, Mr. Hokanson stated, "You currently have an estimated shortfall of $20k+ if you elect TPP." He did not enclose any statement with his email. Shao looked up his loan balance in the 3-31-2020 statement, which was $155,476.56 and his TPP payment summary report of 3-2020, which was $135,487.40. The difference between the two was $19,989.16, slightly shy of $20k.

45. On 8-28-2020, Shao wrote to Mr. Hokanson, asking for the final pay-off figure. Mr. Hokanson replied on 8-31-2020, saying, "I can't calculate the exact amount required until TPP has been finalized. [...] Based on the numbers today, an estimated paydown of $30k would provide the necessary buffer to cover the shortfall." He said that Shao would be contacted in September

29

2020. However, when Shao was not contacted by Mr. Hokanson for the final pay-off figure at the end of October, Shao wrote an email on 10-28-2020 to remind him.

46. Mr. Hokanson responded on 11-4-2020, saying, "Committee is requesting a $25,000 paydown by 11/15." This was contrary to what Shao had on record. As of 9/30/2020, Allstate was saying that Shao's loan balance was $143,332.74 and his TPP payment was $129,973.21. (The two are required to be offset against each other.) The difference was $13,359.53. Shao sent to Allstate Finance a check of $2,851.44 on 10-22-2020 and another check of $10,508.09 on 12-8-2020. Both checks had been cashed by Allstate. The sum of these two checks is $13,359.53, which was the difference between the loan balance and the TPP payment, as calculated by Allstate. And yet Mr. Hokanson wrote back on 12-17-2020 without a PMT schedule, stating, "We need to receive $8,120.88 by 1/10." Shao demanded a PMT schedule and referred the matter to his attorney Jeffrey Vogelman ("Mr. Vogelman"). Finally, on 1-6-2020, Mr. Hokanson provided a schedule, which showed how he reached this sum of $8,120.88.

47. Shao's 8-2020 Termination Payment (TPP) – Summary Report, received from Ms. Smith, showed that only $960,772.39, specified as Termination Payment Eligible 12 MM Earned Premium, of $1,353,508.91 of the 12 MM Earned Premium (his book value) was calculated for the stated TPP payment. The difference sum of $392,736.52 (=$1,353,508.91-$960,772.39) was excluded or non-eligible for payment per Allstate's calculation. If the formula set forth in paragraph 6 above were applied, the payment sum would be $53,019.43 (= 1.5 x .09 x $392,736.52). (Shao actually paid $92,293.08 [=2.35 x .1 x $392,736.52] in 2015 for this excluded portion of the book.) If this book were sold to any normal buyer, the excluded sum of $392,736.52 would be included in the calculation of the

selling price. Shao had asked his supervisor Ms. Smith the reason for the exclusion, and she did not provide an answer. Shao asked Mr. Hokanson, who in his 1/6/2021 email, replied, "I don't have an answer for why a part of you[r] book being excluded from your TPP. That would need to go to someone in agency compensation." Shao did contact agency compensatio⁻ in June 2020 and received no answer. In fact, Shao had asked Attorney Mr. Vogelman to contact Allstate counsel David J. Mueller ("Mr. Mueller") for an answer on 11-4-2020. Mr. Mueller wrote on 11/18/2020, "Hi Jeff, I apologize for the delayed response to your inquiry. While I can't give you any opinion about the method your client used to determine the purchase price of the agency, I can advise you that the termination payment report reflects both the eligible earned premium and the earned premium. Only the eligible earned premium is used for the termination payment." He merely reiterated the headings of the TPP report without giving an explanation.

48. Mr. Vogelman wrote to Mr. Mueller again on 1-19-2021, pressing for an answer. This time Mr. Mueller provided the explanation, "Typically, the difference between the two premium amounts is due to business that had been written by a prior Allstate agent who operated using an employee agent agreement. **Employee agent business is generally always excluded from TPP eligibility** (Bold Pro se litigant's). In this case, it would appear your client considered 'earned premium' in his purchase decision rather than only 'eligible earned premium.'" What Mr. Mueller was evidently saying was that the premium $392,736.52 of the book had been generated by policies written by Allstate employee salespersons; therefore, they are non-eligible earned premiums, while the premiums $960,772.39 of the book had been generated by policies written by Allstate independent contractor salespersons; therefore, they are

eligible earned premiums. To an outside buyer, such a distinction did not seem to exist, or could be known. Ms. Shaner, who knew about this distinction, and knew which policies had been employee-agent written and which were not, concealed this knowledge from Shao in order to make the sale. Mr. Mueller pointed out that this eligible criterion was provided in the Supplement for the R3001 Agreement, the contract between Allstate and Shao, and it was the duty of the buyer to exercise the "due diligence and deciding which policies to consider in the purchase of the economic interest and, in general, how to value the economic interest that he purchased." There are several issues involved in Mr. Mueller's assertion.

49. First, the term "eligible earned premium," used by Mr. Mueller, cannot be located in the Supplement for the R3001 Agreement throughout the said document. There is in fact no such term or concept in the contract between Shao and Allstate.

50. Second, the Supplement was intentionally or by design not made known to Shao at the signing of the contract in the summer of 2015. Shao had a three-week training session that summer at the Allstate Regional Center in Chantilly, Virginia. Suddenly, on 6/3/2015, all students (who were to become agents) were given a blank form of the main contract to sign and were told that the entire contract could be found at the computer Gateway platform, which students could not access at that time due to having no access code to the said platform. Yet, Shao together with the other students were required to sign the blank forms at that time.

51. Third, the whole procedure and environment for signing the blank contract form was hurried and conducted with an inducing atmosphere.

52. Fourth, Shao received on 8/5/2015 from Ms. Diana Heflin of Allstate's Capital Region-Strategic Deployment an email, which stated, "A copy of the signed agreement is attached for your records." The attachment was a ten-page main contract plus a two-page sample of a Confidentiality and Non-competition Agreement. There was no mention or delivery of the Supplement (456 pages.) and the Independent Contractor Manual (49 pages.), which were an integral part of the contract. Only Allstate Agency Standards (26 pages.), which was also an integral part of the contract, was given to Shao before the 6-3-2015 signing of the agreement, as part of the training materials. It was, among other things, **bad faith** on the part of Allstate choosing not to providing the full agreement upfront, not making available reasonable time for Shao to review the agreement, and not furnishing a signing environment which was free of coercion and inducing influences.

53. Fifth, Shao signed a separate sales contract to buy the book under question from Mr. Elliott, President of Washington Associates, Inc., on 6-5-2015, which was two days after signing the Allstate contract form. Two days were hardly enough to allow Shao to pursue, in Mr. Mueller's words, "due diligence and deciding which policies to consider in the purchase of the economic interest and, in general, how to value the economic interest that he purchased." The whole process was staged by Allstate to hinder due diligence from Shao, and Allstate was secretive in revealing who, under Allstate's classification of employee agent and independent contractor, wrote each policy in the book Shao was going to purchase. Ms. Shaner was an accomplice of the scheme of keeping this information from Shao.

54. Sixth, as described in the above paragraphs 12, 18 and 19, Ms. Smith (around 2-20-2020), Allstate's Agency Compensation Department (6-2020), Mr. Hokanson (1-16-2021), and Mr.

Mueller (11-18-2020) all declined to explain why a portion of the book was excluded from consideration for the TPP payment. There was a concerted effort by them to be evasive on this topic, because they knew that Shao was not informed of this "secret" of Allstate at the time when he purchased the book in question. Finally, with pressure from Mr. Vogelman of a second letter (1-17-2021), Mr. Mueller reluctantly provided an explanation of this topic under question above. This was 1-22-2021, two months and 4 days after his first evasive letter. This lack of candor on the said topic by Ms. Smith, the Compensation Department, Mr. Hokanson, Mr. Mueller, and Ms. Shaner was understandably in line with Allstate's corporate culture of **bad faith**. There is, importantly, no agreement for Allstate to exclude a portion of the book from the TPP payment; this is simply not part of any contract (without even considering the way in which the contract was executed between Shao and Allstate). Shao had been paid 10% commission on the portion of book which Allstate claimed to be written employee-agents for the past 5 years as those by the non-employee-agents.

55. Allstate had planned to discontinue the Trusted Advisor program in 2015-16; however, it continued promoting this program until the end of 2018 to recruit new agents under this banner. Shao was deceived into believing the program was a long-term business mission of Allstate and made the purchase of an Allstate agency in the summer of 2015. Allstate staged the signing of the contract in such a bad faith way to deprive Shao of a proper, non-coercive setting of signing a contract, of a reasonable time to review the contract, and of the availability of the entire content of the contract prior to the signing. Furthermore, Allstate and Ms. Shaner hid the insider information of who had produced or written the initial policy in terms of an employee salesperson or an independent contractor salesperson, the

distinction of which would arbitrarily give Allstate an alleged excuse of refusing to pay the TPP payment in full. Moreover, Allstate has excluded a portion of the book from the TPP payment without any contractual basis thereof.

56. The yardsticks of "profitability, growth, retention, customer satisfaction and customer service," (II.B) as stated in the main agreement are standard categories used to measure the success and failure and insurance agency. Particularly, the profitability. If not profitable, an agency will soon be out of business. Profitability is tied to Loss Ratio. The standard benchmark is 70%, which means 70% of the premiums collected are used to pay the customer's claim and 30% is the overhead costs of running the insurance company. Shao's Adjusted Paid Loss Ratio – 24MM in November 2018 was 45.87%. Therefore, profits to Allstate are: 15.13% = 100% - 45.87% Loss - 9% Shao's Economic Interest - 30% Company's Overhead. Shao's agency was profitable to Allstate. Shao believes that his Loss Ratio was above average among his peers. Some, who were terminated by Allstate, had a Loss Ratio below 30%. In the 10/7/22 Shao's Set of Requests for Production, Shao asked in Request No. 11 Allstate to produce "All statistics and data in loss ratio for all agencies which were ABO'ed in 2019 and 2020." Allstate's counsel Mr. Bred C. Marfut ('Mr. Marfut") declined to produce. Shao believes that, with very few exceptions, the ABO'ed agencies had below 70% Loss Ratio and were profitable to Allstate. Then Why ABO'ed them? Because the mega agency Esurance, owned and operated by Allstate, had been a money loser for nine years due to the high/unprofitable Loss Ratio, which is also called Underwriting Loss.

57. Due to the great effort of ex-agent Collin Brennan ("Mr. Brennan"), who had studied the Allstate Annual Reports of nine years, digging out the following figures:

| Esurance Underwriting Losses | | Allstate Brand Underwriting Profit/Loss | |
|---|---|---|---|
| 2011 | $(37,000,000.00) | 2011 | $(666,000,000.00) |
| 2012 | $(192,000,000.00) | 2012 | $1,539,000,000.00 |
| 2013 | $(218,000,000.00) | 2013 | $2,551,000,000.00 |
| 2014 | $(259,000,000.00) | 2014 | $2,235,000,000.00 |
| 2015 | $(164,000,000.00) | 2015 | $1,812,000,000.00 |
| 2016 | $(124,000,000.00) | 2016 | $1,447,000,000.00 |
| 2017 | $(56,000,000.00) | 2017 | $2,387,000,000.00 |
| 2018 | $(25,000,000.00) | 2018 | $2,357,000,000.00 |
| 2019 | $(43,000,000.00) | 2019 | $2,951,000,000.00 |
| Total | $(1,118,000,000.00) | Total | $16,613,000,000.00 |

58. We can see that in the past 9 years Allstate EA system has paid over $1.118 B (average $122 million per year) towards Esurance's underwriting loss (unprofitable Loss Ratio). Allstate took on average each year, 122 million from Allstate to cover the loss of Esurance. A white elephant, indeed! Or, to use a cliché -- a cancer in the heart of the business health of Allstate.

59. Allstate purchased this white elephant in May 2011 for one billion dollars and allegedly, according to Allstate investor Ms. Denise Sundquist, who filed on 5-21-2018 a derivative (in the sense that Ms. Sundquist did not file the complaint for her own personal interest) lawsuit on behalf of all other investors and Allstate Co. against Allstate Co. and fifteen current and former officers and board directors, among whom were Mr. Wilson and Mr. Winter (the predecessor of Mr. Shapiro), the defendants, in Judge Gettleman's summary of the case[10], breached their fiduciary duties to Allstate, were unjustly enriched by the cash that they received from Allstate, wasted Allstate's assets, and "misappropriated material, non-public information by selling Allstate shares when they knew that their false statements had artificially inflated Allstate's stock price." *Id*. Early on two similar suits were made by

---

[10] Judge Robert W. Gettleman, *Memorandum Opinion and Order* (Case No. 18 CV 3598), 12-04-2018, p.1.s.

investors: Biefeldt v. Wilson et al., No. 2017-CH-10676 (Ill. Cir. Ct.) and IBEW Local 98 Pension

Fund v. Wilson et al.; the two suits were consolidated under Biefeldt on 7-26-18.

60. These lawsuits, which named the upper echelons individually as defendants, making them

personally liable, have struck fear into the hearts of the untouchables, who wanted finding a

way to cover up their impotencies in making Esurance profitable. They are not empire-

builders who relished strengthening Allstate to become a strong company, but empire-

robbers who chipped away the good assets (EA channels) to fill the belly of a bad investment

(Esurance). They took EA agents' books and staff by getting rid of them through ABO and

minor infraction of rules and regulations to build a mega super agency of direct sales, which

has adopted Esurance as a newborn son by erasing its identity. This move of Allstate blunts

investors' accusation of poor performance in acquiring Esurance.

61. Below are the people who had sold the stock options in the ten years prior to March 2021:

(The table below was created by ex-agent Mr. Brennan in his studying the SEC Forms.)

| Stock Sold Prev 10 Years | |
|---|---|
| Executive | Value Sold |
| Michelle Mayes | $ 1,385,465.00 |
| Joan Walker | $ 3,282,614.00 |
| James DeVries | $ 7,561,581.00 |
| Steven Varney | $ 10,340,761.00 |
| Katherine Mabe | $ 4,506,632.00 |
| Judith Greffin | $ 16,943,446.00 |
| Samual Pilch | $ 18,631,375.00 |
| Sanjay Gupta | $ 8,047,594.00 |
| Matthew Winter | $ 34,882,107.00 |
| Suren Gupta | $ 16,507,834.00 |
| Harriet Harty | $ 2,996,033.00 |
| Mary Jane Fortin | $ 1,018,444.00 |
| Steven Shebik | $ 23,307,441.00 |
| Mario Rizzo | $ 676,271.00 |
| Susan Lees | $ 19,168,963.00 |
| Don Civgin | $ 80,332,492.00 |
| Jesse Merten | $ 2,951,332.00 |
| Glenn Shapiro | $ 8,673,479.00 |
| Tom Wilson | $ 108,834,909.00 |
| Total | $ 370,048,773.00 |

62. To line the upper echelons' wallets through stock options, the bottom lines are the key. The

equities of the EV agents had been raided to firm up the company's bottom lines. Shao has a

small agency. He lost the sum of $200,000 approx. for his investment. Most agents would

lose much more than that. For the sake of illustration, let us say each agent lost $200,000.

the number of the exclusive agent force had come down from the official figure of 10,800[11]

in 2019 to the estimated figure of less than 8,000 in 2022 by Ted Paris.[12] Among these 2,500

---

[11] From the Annual Report, provided to me by Collin Brennon.

[12] Ted Paris, the executive director of NAPAA, stated on 1-23-22 in the FB All Agents Page, "From my data base of agency owners here are the numbers of agents at Allstate:

502 of the new work from home

656 EFS

7,000+ agency owners not including home from home

1,362 agents own more than one location

8,452 Exclusive agents office locations.

4,400+ Exclusive agents appointed since 1-1-2015

or so agents, some were able to sell their agencies and exit without too much financial harm done to them. However, for a thousand or so – (this is a guess), since Allstate has not been transparent in their statistics - agents whose books had been confiscated or appropriated, must have had at least a loss of $200,000. Then the total equities seized by Allstate from its agents are at least: $200,000,000 (= 1,000 ABO'ed Agents x $200,000 Equity Loss). This indeed is a hefty sum to firm up the bottom lines of the company to enable the higher stock price for the stock options to the higher echelons, who had enjoyed a swelling wallet.

63. The case of *Nocella et al. v. Allstate et al.* is an example of a horror story, which ended happily, but it shows how profitable TPP is to Allstate's treasury. At the time of Mr. Nocella's termination, Allstate was allegedly only willing to pay him $98,325.74 as TPP payment for his economic interest of a $5.1 million book of business with super loss ratio and retention. The market value of such a book was worth at least $1.6 million. Allstate gave him the deadline day of 7/1/18 to sell his book. He finally sold the book for $1.6 million on 8/15/18. (Case No. Case 2:18-cv-01995-ADS-AYS Doc. 23 Ex. A, B at 888-901 (E.D. NY 08/24/18)) His attorney's speedy filing earned him an additional 45 days to market his book to receive, in the end, a decent market value. **Mr. Nocella would indeed be penniless after the TPP was forced upon him by Allstate.**

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

---

2.942 IA contracts

THESE ARE NOT OFFICIAL COMPANY NUMBERS. THESE ARF FROM MY DATA BASE. OFFICIAL NUMBERS COULD BE DIFFERENT."

He also claimed, "last year from memory 10,500 locations. 8,100 agency owners, 900 EFS, 3,500 I A's. Again from memory and these are not official from Allstate. It's my data base"

He further stated, "In 2010/2011 it was reported as 13,000 by Crain's."

## FAILURE TO PAY FULL TPP AMOUNT
### (Against Allstate)

64. Plaintiff repeats and re-alleges each and every allegation set forth in paragraph 1 through 63 of this Complaint as though each were separately and specifically set forth herein.

65. Shao paid on 10-22-2020 and 12-8-2020 in two installments the difference amount ($13,359.53) of the balance sum ($143,332.74) of his loan from Allstate and the Allstate-dictated TPP payment amount ($129,973.21) to Shao. In a normal situation, this *good faith* payment should cancel the loan under question. However, Allstate took the position that the TPP amount should have been paid out in 24 monthly installments, although there is no contractual basis for this; therefore, Allstate claims the loan amount is to be charged an interest rate of 6.6% until the end of the 24 months, at which time Shao will owe a sum of $8,120.88. Allstate had also appropriated Shao's book of $1,353,508.91 and unilaterally decided that it would only pay $129,973.21 on the portion of the book of $960,772.39, classified by Allstate as Termination Payment Eligible 12 MM Earned Premium, and would exclude $392,736.52 (= $1,353,508.91 - $960,772.39), because this portion of the book was written by employee salespersons of Allstate, although there is no contractual basis for this either. Allstate would not pay a lump sum of $129,973.21 now but would only do 24 installments of $5,415.55 each month. Since Allstate had not paid the full lump sum of the buyout amount of $129,973.21 in its unilateral appropriation of Shao's book, Shao's financial interests in the book remained in force until the final payment was made. Therefore, Shao asks Allstate to pay him the prevailing annual commission of 9% on the sum of $960,772.39 since he still owned the economic interest of the book. As a result, for a single year, the amount of this commission payment is $8,646.95 and the two-year sum is $17,293.90.

66. As a direct and proximate result of Allstate's failure to pay the full "buy back" payment, Plaintiff Shao has suffered significant monetary loss in at least the amount of $17,293.90 and other damage and injury such as loss of closing the agency office due to the no-compete agreement and his health, both physically and mentally, due to five years of abuses of an adverse working environment.

## SECOND CAUSE OF ACTION
### FAILURE TO PAY THE PORTION OF THE BOOK, WRITTEN BY EMPLOYEE SALESPERSONS
### (Against Allstate)

67. Plaintiff repeats and re-alleges each and every allegation set forth in paragraph 1 through 63 of this Complaint as though each were separately and specifically set forth herein.

68. Allstate staged the signing of the contract in such a *bad faith* way to deprive Shao of a proper, non-coercive setting of signing a contract, of a reasonable time to review the contract, and of the availability of the content of the contract prior to the signing. Allstate orchestrated an organized and systematic scheme to prevent outside buyers of Allstate agencies including Shao's, to conduct due diligence in finding out the terms of the contract which would permit Allstate to refuse payment of those policies written by Allstate employee salesperson.

69. Whether a policy had been written by an Allstate employee salesperson or not was privileged knowledge, only known to Allstate insiders. Ms. Shaner knew this scheme of Allstate's and knew the book Shao was going to purchase consisted of policies written by Allstate employee salespersons (not disclosed to Shao until Allstate terminated his agency, and for which there is no contractual basis), and knew that, when TPP'ed, Shao would not receive his full TPP payment. She participated in this *bad faith* scheme of Allstate by keeping her silence.

70. It is Ms. Shaner's non-effort or silence or non-transparency or concealment of the fact that Allstate, when TPP'ed, would refuse to pay Shao a dime of the vast sum of policies he had purchased. Ms. Shaner acted as an agent in Shao's purchase of Mr. Elliott Elliott's agency, and she owed him the fiduciary duty of care, loyalty, and candor to inform him the "defect (at least in the eyes of Allstate)" of some policies he purchased, even though Allstate paid her the commission. In real estate transactions, the seller pays the commission to all agents, but the buyer agent still owes the buyer the fiduciary duty of care, royalty, and candor. In this case, Allstate paid the commission to Ms. Shaner. This fact should not negate that she owed Shao the fiduciary obligation to inform him some policies were "defective" in the eyes of Allstate when TPP'ed. Toni was an employee of Allstate, whose iron fist hung mightily over her head, her silence was understandable. Her silence came from Allstate.

71. For those policies in the book which, Allstate declares, were written by Allstate employee salesperson, not by non-employee salespersons, were excluded from the 9% commission, used to calculate the value of the book. Allstate did not have non-employee salespersons before the year 2000; therefore, all policies in the book written before 2000 are not eligible for the 9% commission calculation in TPP valuation. But Allstate had paid Shao 9-10% on those policies in the 5+ years prior to TPP, disregarding the fact that those policies were written by an employee salesperson. Allstate claims that the EA Agreement gives Allstate the right to null the ownership of Shao's economic interest of these "marked as outcast/birth defect" policies by Allstate at the time of TPP. This is appropriate with zero compensation. An act of highway robbery.

72. As a direct and proximate result of Allstate's failure to pay the economic interest of the excluded portion of the book, which Shao had paid the sum of $92,293.08 to purchase , Plaintiff Shao has suffered significant monetary loss in at least the amount of $53,019.43 and other damage and injury such as loss of closing the agency office due to the no-compete agreement and his health, both physically and mentally, due to five years of abuses of an adverse working environment.

## THIRD CAUSE OF ACTION
### FAILURE TO PROVIDE A TRANSITIONAL TIME FOR SHAO TO EXIT ALLSTATE TO MINIMIZE HIS LOSS DUE TO ALLSTATE'S SUDDEN ABANDONMENT THE TRUSTED ADVISOR PROGRAM UNDER WHICH SHAO WAS RECRUITED
### (Against Allstate)

73. Allstate had planned to discontinue the Trusted Advisor program in 2015-16; however, it continued promoting this program until the end of 2018 to recruit new agents under this banner. Shao was deceived – Recruiter Ms. Shaner emphasized in 2015 the ongoing Trusted Advisor program as the future of Allstate -- into believing the program was a long-term business mission of Allstate and made the purchase of an Allstate agency in the summer of 2015. Out of blue (at least to agents) Allstate suddenly instituted an ABO program in 2019 without giving agents time to exit with financial compensation from Allstate, as most Fortune 500 companies would do, when the company had a major restructure to change the direction of the company, which affected the life of the entire agency force.

74. As a result of such concealed and sudden changes, Shao incurred great financial loss. At the time of 11-2018, Shao's book of premium was $1,530,114, which had a market value of $359,576.79 (= 10% x $1,530,114 x 2.35) if the agency had a good life production or

$275,420.52 (9% x $1,530,114 x 2) if it had no life production. As shown above Allstate deliberately destroyed Shao's life production since 2017, it is reasonable to value the agency's market value at: $359,576.79.

75. Allstate paid only an ABO confiscation fee of $129,973.21.

76. Therefore, Plaintiff Shao requests compensatory damages of $229,603.58(=$359,576.79 - $129,973.21).

## FOURTH CAUSE OF ACTION
### CONVERSION AGAINST ALLSTATE
### (Against Allstate)

77. Shao owned the economic interest of the book of Allstate insurance policies he purchased, which is ownership of property rights. Allstate agents' including Shao's claim of ownership of the economic interest of the policies they have purchased is as good as that of the independent agent, because Allstate agent has paid a similar amount of market prices based on a multiplier of 1.5 to 2.5 in the industrial standard formular in calculating the value of an agency.

78. A genuine "buyout" by paying the full market value on the "cut" of premium of the entire book will lawfully nullify Shao's ownership. TPP is not a genuine buyout. The termination of the EA Agreement does not relieve Allstate from paying Shao his "cut" of the premium, generated by his book of business. This view is expressed in the *Amended Complaint* by Attorney Anthony DellUniversita ("DellUniversita") in *Nocella et al. v. Allstate et al.* (Case No. Case 2:18-cv-01995-ADS-AYS Doc. 7 at 655(E.D. NY 08/24/18)) by quoting N.Y. Ins. 3425 (j)(l)(D), which states, terminated agent or broker shall be entitled to receive commissions on accounts of all business continued or written, at the insurers prevailing commission rate. He

declares, "Allstate's intention to no longer compensate Nocella for his commission is a direct violation of N.Y. Ins. [Laws]." *Id*.

79. Allstate attorney counters with the argument that this N.Y. Ins, law is only applicable to IA, not EA, and Nocella is an EA. However, Nocella is a crossbreed between IA and EA due to the invention of the economic interest of a book of business by Allstate. A true-blue blood EA like a State Farm agent does not have an economic interest in his/her book of business. He or she only has a vested tenure-ship of his or her book. Once that tenure-ship is terminated, he or she is not entitled to receive any commission from the vested book. A true-bule blood IA like a Travelers agent does have full ownership of the policies in his/her book of business. When Travelers terminates its contract with the IA, the said IA cannot sell Travelers' products from the day onward after the termination of the contract. However, he/she may have some Travelers policies in his/her book of business. Travelers would take ownership of these policies; however, the N.Y. Ins. Law 3425 states that insurance carrier must pay the ongoing "cut" of premium, generated from those said policies, which the said IA has owned. In fact, this law transfers the full ownership of policies to a leasehold-like economic interest of the policies under question, which the IA formerly had full ownership. This leasehold-like economic interest is valid as long as the said policies are active. Nocella's economic interest of his book of business is identical to that of the said Travelers IA, who gives up the full ownership of the policies in question but retains the "cut" of the premium as long as the policies are active. This N.Y. ins. Law validates the sacredness of the ownership of private property; in this case, the leasehold-like economic interest of the book of business. The spirit

of this law should validate Mr. DellUniversita's claim that Allstate must compensate ex-agents of Allstate on their book of business.

80. Virginia does not have a statue like the N.Y. Ins. Law 3425, but the spirit of the latter has its grounding in the Constitution.

81. The Fifth and Fourteen Amendments to the Constitution as well as the Article I, Section 11 of the Virginia Constitution specifies that eminent domain can only be carried out if property owners are provided with fair and just compensation to make up for the property they are losing. And, yet Allstate can use TPP to seize agent's ownership of the economic interest with zero compensation for a portion of the book's policies, "marked as outcast policies" or "eligible earned premium" by Allstate (which Shao had paid in 2015 the sum of $92,293.08 [=2.35 x .1 x $392,736.52] for this excluded portion of the book and had received 10% commission from Allstate for the 5 plus year before the execution of the TPP) with below market price compensation for the remaining portion of the book. Allstate is mightier than the federal and state governments. Allstate claims that it has the right to do so, because agents have signed the EA Agreement, which grants Allstate the supreme power over its captive agents, literally like a sovereign king over its subjects or captive agents as bondservants. A slave contract is no longer legal in this country. Furthermore, TPP is not in the main agreement between Allstate and Shao. But in the ever-changing, one-sided Supplement, which Allstate can change at will.

82. Such a contract, which gives one party the right to forfeit at will another party's personal property without just compensation, violates the Virginia law of conversion.

83. By TPP Allstate misappropriated the ownership of the economic interests (an annual incomes of about $144,590.60) of the book of business (Annual Premium of $1,445,906) Shao purchased with the sum of $339,767.91 in 2015, Allstate unlawfully exercised dominion over Shao's property.

84. Moreover, as Allstate's conduct was intentional and done in willful and reckless disregard of Plaintiff Shao's rights, the misconduct warrants an award of punitive damages in the amount of $350,000.

## FIFTH CAUSE OF ACTION
### INTENT TO DECEIVE IN THE TITLE WAS EXPRESSIVELY CONTRADICTED BY ALLSTATE IN THE CONTENT OF THE EA AGREEMENT – THE EA AGREEMENT IS A BAD FAITH CONTRACT
### (Against Allstate)

85. The agreement is entitled, "Allstate R3001S **Exclusive Agency** Agreement." Exclusive Agency (EA) has 70 years plus history and tradition before Allstate converted all its employee salespersons in 1999. EA means no production quota and the captor/employing company is exclusive in the sense that it would not open a mega agency to sell insurance to compete with its agent force or distribute its insurance products through independent agency channels as exemplified by State Farm in exchange for the exclusiveness of the agent who can sell only the brand of the captor company.

86. In 1999, Allstate reneged on its promise of retirement benefits to the employee salespersons and converted all of them to become exclusive agents with the Allstate R3001 contract. Then,

in the contract, there was no production quota (ABO)[13] and Allstate did not operate a mega agency to compete with its agents.

87. Allstate's going back on its promise of paying employee benefits to its employee salespersons resulted in the famous Romero Lawsuits: *Romero, et al. v. Allstate Ins. Co., et al.*, No. 01-3894, and *Romero, et al. v. Allstate Ins. Co., et al.*, No. 01-6764. The Romero suit grew from 30 to approx. 430 plaintiffs and was first filed in 2001 and, up until 2015, there was no closure. Finally, the Romero case merged with the Tabor case (*Tabor, et al. v. Allstate Ins. Co., et al.*, No. 2:15-cv-02602-MAK) on 4/18/17 and a settlement was reached on 7/28/17. Because Allstate's desire of refraining from paying its agent force the employee benefits, it converted its agents to an independent contractor of EA with no production quota and Allstate as a captor company of EA tradition is not supposed to operate a mega agency to compete with its agents.

88. Immediately, in Paragraph XX.E and XX.F of the main agreement there are the following statements, "The authority granted to you under this Agreement is **nonexclusive** (It means the title of the Agreement lies about being "exclusive agency!"). The term 'Exclusive' as used in the title of this Agreement refers to the obligations assumed by you (agent-signee but not Allstate!) under Section I.E [of the Main]," and "The descriptive headings of this Agreement are intended **for reference only** and will not affect the construction or interpretation of this Agreement." It means that "the descriptive headings of this agreement" is only front/sheep's clothing to fool Plaintiff Shao of the true intent of the contract. The title of the EA Agreement

---

[13] See Note 6.

is meant to deceive the other party of the contract with bad faith. A deceptive contract with

bad faith is deemed unlawful in the eyes of law.

## SIXTH CAUSE OF ACTION
### ALLSTATE VIOLATES THE PRINCIPLE OF CONSIDERATION IN THE CONTRACT LAW BY ABANDONING THE PRINCIPLE OF RECIPROCITY IN ITS EA RELATIONSHIP
(Against Allstate)

89. EA stands for exclusive agency or exclusive captive agency. EA can only sell the insurance

policies of its captor/employing company's brand.

90. In return, in according to the principle of reciprocity or the principle of consideration in

contract law, the employing/captor company would commit itself to refrain from opening a

super mega agency to sell its products and distributing to non-captive independent agencies

to sell its pro⁴ucts, as the obligation of good faith and fair dealing demand of both parties of

the contract.

91. Allstate has operated at least one super mega agency, Esurance, since 2011, and distributes

to non-captive independent agencies to sell its products, competing with its EA forces.

92. Allstate violates the principle of consideration in the EA Agreement, which thus is unlawful.

## SEVENTH CAUSE OF ACTION
### ABO (ALLSTATE PRODUCTION QUOTA) NULLS THE STATUS OF AN EA AS AN INDEPENDENT CONTRACTOR AND ALLSTATE FAILS TO RECLASSIFY THEM AS EMPLOYEE SALESPERSONS WHO DESERVE THE EMPLOYEE BENEFITS
(Against Allstate)

93. Captor company demands the EA to write only insurance policies of its brand. It controls

where the agent's office is to be located. The offices hours. The color of the walls. And a million

49

other things. How then the IRS principle of "cannot-be-controlled" for an independent contractor be justified by the captor/employing company? The answer is no production quota, which is the hallmark which defines the EA tradition, exemplified by State Farm and Nationwide. A tradition has 100 years of history.

94. Allstate knew it full well and, when it converted its entire sales force of employee salespersons in 2000 to independent contractors of the EA, it dropped the production quota in the R3001 EA Agreement from 2000 to 2012 for 13 years. (Exhibit A.2.a.) For that period, Allstate's agents were truly an independent contractor in the EA tradition.

95. When Allstate brought back the quota in a fussy manner in 2013 without executing it, it bordered on stripping the EAs the independent contractor status in the EA tradition. When it was executed in a rigid form in 2019, it had turned his entire sales force of EAs into employee salesperson as those in the year 1999. Therefore, Allstate agents have only been in name as EA agents but, in fact, employee salesperson without the benefits of being an employee. Allstate failed to exercise the obligation of good faith and fair dealing demand of both parties to the contract.

## EIGHTTH CAUSE OF ACTION

### ALLSTATE HAS THE TRAIT OF A POLICE STATE IN THE SENSE THAT IT DENIES DUE PROCESS IN ITS ADMINISTRATIVE DISIPLINARY OPERATION FOR FAILURE TO PROVIDE EVIDENCE TO SUPPORT ITS ACCUSATION AND FAILURE TO GIVE THE ACCUSED AN OPPORTUNITY TO DEFEND HIMSELF/HERSELF
### (Against Allstate)

96. In November 2015, Shao was asked to sign a Letter of Understanding for his life sub-agent Mr. Reid's misbehavior, which was not specified in the Letter; therefore, there was no specific deed of misbehavior either for Shao or for Mr. Reid being spelled out in the Letter. Shao asked

his New Agent Sales Leader Mr. Beckner for the exact misbehavior under question, the findings, and the report of the investigation. (Exhibit c.1, Attachment#12 (5 pages), pp. 35-36.) He did not receive the report or a response.

97. Shao consulted an attorney, who found it odd that if Mr. Reid did not commit any inappropriate act which could be spelled out clearly in writing and if Shao's appointment of him went through the prescribed procedures of Allstate as Mr. Elliott had done, Shao was asked to acknowledge having not supervised Bryan well. However, in the attorney's view, for practical reason Shao might consider signing the Letter, because, even if no action might have been taken by Allstate for not signing, Shao would be crippled in carrying on the tasks of an agent in the future. He suggested that Shao went to a mediation department of Allstate to get a clarification of the offenses he had committed.

98. Shao asked Mr. Beckner about Allstate's mediation department as an ombudsman. Mr. Beckner said there was not such a department.

99. Allstate does not mediate or allows due process for agent grievance, even for TPP, the appropriation of agent's economic interest of the insurance policy book, Allstate denies due process, which is mandated by the Fourteenth Amendment.

100.    Allstate strong-armed Crump/Gerber, which was owned by Allstate, to revoke their contract with Mr. Reid without providing a reason.

## NINETH CAUSE OF ACTION
### RULE OF LAW HAD NOT BEEN EVENLY OR EQUITABLY APPLIED IN THE REALM OF ALLSTATE IN DISCIPLING ITS MEMBERS – WITH SOME ABOVE RECEIVING NO PUNISHMENT AND SOME BELOW WITH HARSH PUNISHMENT
### (Against Allstate)

101.   Shao wrote in his 9/3/19 email to his Field Sales Leader Ms. Smith, stating, "Kia [Vassar, Life Underwriter] had violated the standard procedure of life underwriting and members of NCT, Michelle and Jeremy had violated the rules and regulations defining an Allstate independent agent. They were not accountable for their violations." (Exhibit C.2, 9/3/19 Email to Ms. Smith: p. 5.) However, Agent Suzie Xu admitted that she had violated the rules and regulations but prayed for leniency, which was not granted to her.

102.   With the above email as the only attachment, I wrote on same day 9/3/19 to Mr. Wilson, asking, "I with humility in my heart implore you to grant Suzie [Xu] some leniencies." In the same letter I said, "I am troubled by the fact that Robert [Hopkins] (Regional Financial Leader), Rick [Bosworth] (Chief Underwriter of Life Underwriting) and Duane [Crupper] (Field Sales Leader of Agent Ms. Xu) are all no longer with Allstate. Robert and Rick had helped me to reinstate my life policy and Duane had spoken openly like me that Suzie [Xu] might have been punished too harshly." Shao subtly hindered to Mr. Wilson what he openly complained to Ms. Smith, "[O]ne set of members [of Allstate] is above the law and the other below." (*Ibid.*)

103.   Ms. Smith and Mr. Simon, who continued their efforts to make Shao sell his agency with the implication that he did not belong here in Allstate, were not disciplined. He was the "enemy" of the Capital Region. So was Mr. Hopkins, Mr. Bosworth, and Mr. Crupper.

104.   Nor were Hilarie (Financial Compliance) and David Peters (Financial Sales Leader), who falsely claim in August 2019 that Shao was required by SEC to report on U4 the five books he had published in China and Taiwan before 2015 when he joined Allstate. (Exhibit D.2.)

105.   CEO Mr. Wilson, in his grand structure plan of 2020, did fire the Field Senior VP Mr. Becker and the Field Sales Leader Ms. Smith at the year's end of 2020. It was much too late for Shao

to salvage his agency and to regain his health.Senior VP Mr. Becker and the Field Sales Leader

Ms. Smith at the year's end of 2020. It was much too late for Shao to salvage his agency and

to regain his health.

## TENTH CAUSE OF ACTION
### ALLSTATE HAS a second TRAIT OF A POLICE STATE IN THE SENSE THAT IT SILENCES AND/OR PUNISHES THE EXPRESSIONS OF MAN'S-HUMANITY-TO-MAN AMONG AGENTS AND ALLSTTE MEMBERS
### (Against Allstate)

106.    Allstate punished Shao for expressing sympathy to his follow agent Ms. Xu.

107.    Allstate forced out Mr. Crupper (Field Sales Leader of Agent Ms. Xu) to express the view

that the punishment for Ms. Xu was too harsh.

108.    When Ted Paris ("Mr. Paris," who is the executive director of NAPAA, which stands for

"National Association of Professional Allstate Agents") expressed on 6/4/20, in response to

Shao's 6/3/20 poem post in the Facebook *All Agents Page* platform, his sympathy for Shao's

unfortunate plight, saying that many agents in Florida were very disturbed and agitated over

what had happened to him. However, he deleted his own post and Shao's poem post that very

same day. Twenty or so agents supported his action of sympathy. About an hour after he

deleted the posts, he messaged Plaintiff Shao, saying, "Such a shame – they (Did he mean the

upper echelons?) have lost their soul." It is the soul or mentality of a police state. (Exhibit F.2.)

## ELEVENTH CAUSE OF ACTION
### ALLSTATE ENGAGED IN HIGHWAY ROBBERY FIGURATIVELY SPEAKING IN THE SENSE THAT IT CONFISCATES AGENTS' WALLET THROUGH ABO AND TPP TO ENRICH THAT OF ITS HIGHER ECHELONS – ALLSTATE COMMITTED FRAUD
### (Against Allstate)

109.    The case of *Nocella et al. v. Allstate et al.* shows how profitable TPP is to Allstate's treasury. At the time of Mr. Nocella's termination, Allstate was allegedly only willing to pay him $98,325.74 as TPP payment for his economic interest of a $5.1 million book of business with super loss ratio and retention. The market value of such a book was worth at least $1.6 million. Allstate gave him the deadline day of 7/1/18 to sell his book. He finally sold the book for $1.6 million on 8/15/18. (Case No. Case 2:18-cv-01995-ADS-AYS Doc. 23 Ex. A, B at 888-901 (E.D. NY 08/24/18)) His attorney's speedy filing earned him an additional 45 days to market his book to receive, in the end, a decent market value. Mr. Nocella would indeed be penniless after the TPP was forced upon him by Allstate. That would be an approx. $1.5 million gain to Allstate, if Mr. Nocella did not have a good attorney to fight against Allstate.

110.    Not many agents had such a dramatic loss and recovery. Shao is a small fish among agent forces, and he lost approx. a sum of $200,000 due to ABO and TPP. It is estimated that at least 1,000 agents were ABOed, if a minimum of the sum of $200,000 was lost to each ABOed agent. The total sum is a staggering sum of $200 million. The upper echelons had lost $370 million in their mismanagement of the company-owned mega agency Esurance, which would have hurt Allstate's bottom line and thus their stock options. To ABO is to fuel the bottom line of Allstate from agents' pockets.

111.    It swelled the wallets of the upper echelon and emptied the pockets of the agents.

112.    Many agents faced financial ruins after ABOed. And Shao is one of them.

113.    The E3001S EA Agreement has "EA" in its title. Yet in the contract it was stated that "The authority granted to you under this Agreement is **nonexclusive** (It means the title of the

Agreement lies about being "exclusive agency!"). (Paragraph XX.E.) The title of the Agreement is a sheep's clothing to fool Plaintiff Shao of the true intent of the contract, which was not to be an EA agreement.

114.    Allstate did not allow Plaintiff Shao to perform proper due diligence, as described in Paragraph 52-56 above. There was no way for Plaintiff Shao to know that ABO was present in the 2015 Manual, which Shao had no access to at the time when he signed the Agreement.

115.    Allstate had violated the 100 years EA tradition, as delineated in Six Clause of Action, to impose sales quota on its EA agents.

116.    The purpose of ABO is to enrich the wallets of the upper echelons. However, ABO ruined many agents' lives, including Shao's.

## TWELFTH CAUSE OF ACTION
### ALLSTATE HAS VIOLATED PLAINTIFF SHAO'S HUMAN RIGHTS
### (Against Allstate)

117.    A summary of facts was provided in Paragraph 5 above. Detailed descriptions were provided in paragraph 1 through 65 of this Complaint.

118.    Legal arguments were given under Seven Cause of Action, Eight Cause of Action, and Ninth Cause of Action.

119.    Allstate has violated Plaintiff Shao's human rights through discrimination, which violates Virginia Human Rights Act (VHRA), Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act (ADEA).

## THIRTEENTH CAUSE OF ACTION
### ALLSTATE PUT SHAO IN THE HARM'S WAY BY FAILING TO COMPLY WITH THE WHITE
### HOUSE DECLARATION OF STATE OF NATIONAL EMERGENCY ON 3/13.20 DUE TO THE

## COVID-19 PANDEMIC AND WITH VIRGINIA GOVERNOR RALPH NORTHAM'S STAY-AT-HOME ORDER WHICH WAS TO TAKE EFFECT ON 3/30/20 IN DENYING SHAO'S REQUEST FOR AN TERMINATION EXTENSION FOR TWO MONTHS.
### (Against Allstate)

120.    Allstate headquarter denied on 3/16/20 Shao's request for the termination extension,

when the White House declared **a state of national emergency in the United States on**

**3/13/2020**.

121.    In Virginia, Governor Ralph Northam issued a stay-at-home order, which took effect on

March 30, 2020, and expired on June 10, 2020. The order directed all individuals in Virginia

to stay at their place of residence, with exceptions for essential activities such as obtaining

food or medical care, exercising outdoors, and traveling to and from essential businesses.

122.    Allstate knew that, after termination, Shao could not stay home to weather the risk of

catching Covid-19. He had office rents to pay, multiple bills such as internet, telephone, etc.

to pay, if his office was not closed as soon as possible. Thus, the 73-year-old Shao had to run

around town to meet with many people such as his landlord, the cleaners, the technicians,

and the movers to close his office. Clearly Shao was going against the United States and

Virginia State Government's advice of protecting his and others from COVID-19 by refraining

from contacting other human beings to putting everyone's lives at risk. Such risk was forced

upon Shao and others by Allstate.

123.    Allstate should obey the White House's declaration of a state of national emergency and

the Virginia stay-at-home order and should n**ot** force a high-risk senior of age 73 to run

around town to deal with landlord, technicians, cleaners, and movers to close an office when

56

there were no cars on the highway, no people in the shopping centers, and containers filled with corpses were piled up outside N. Y. Hospitals?

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment against Defendant Allstate and grant the following relief:

a. Judgment against Defendant Allstate in the amount of $70,313.33; and

b. Judgment against Defendant Allstate in the amount of $229,603.58; and

c. An award of punitive damages in the amount of $350,000; and

d. Pre-judgment interest from September 1, 2020, and post-judgment interest; and

e. Enter judgment against Allstate for using termination payment (TPP) to appropriate agents' sacred ownership of the economic interest of the book of insurance policy, protected by the Constitution; and

f. Enter judgment against Allstate for its intent to deceive signee-agent Shao in the EA agreement; and

g. Enter judgment against Allstate for violating the principle of consideration in the contract law by abandoning the principle of reciprocity in its EA relationship; and

h. Enter judgment against Allstate for taking away agents' independent contractor status by applying production quota "ABO" and failing to reclassify them as employee salespersons who deserve the employee benefits; and

i.  Enter judgment against Allstate for denying due process in its administrative disciplining operation for failure to provide evidence to support its accusation and failure to give the accused an opportunity to defend himself/herself; and

j.  Enter judgment against Allstate for applying not the rule of law evenly and equitably with some members above the law without punishment and some below with harsh punishment; and

k.  Enter judgment against Allstate for silencing and/or punishing the expressions of man's humanity to man among agents and members of Allstate; and

l.  Enter judgment against Allstate for confiscating agents' wallet through ABO and TPP to enrich that of its higher echelons; and

m.  Enter judgment against Allstate for the violation of Shao's human rights; and

n.  Enter judgment against Allstate for its failure to comply with the White House declaration of state of national emergency on 3/13/20 due to the Covid-19 and with Virginia Governor Ralph Northam's stay-at-home order; and

o.  An award of Plaintiff Shao' legal fees and costs incurred in this litigation; and

p.  Such other and further relief as this Court deems just and proper against Defendant.

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby requests that this action be tried by jury, as to all issues and counts herein.

Dated: August 8, 2023                                      PAUL SHAO,

*Pro se* litigant

58



Paul Shao
9233 Lee Masey Drive,
Lorton, Virginia 22079
(202) 290-6300 Telephone
paulyshao@gmail.com

Exhibits to the present *Amended Complaint after Nonsuit* are the same as those to the original *Complaint after Nonsuit*, which consists of a **table of exhibits** as follows:

**Exhibit AA: Agreed Order of Nonsuit**

**Exhibit A.1: Allstate R3001S Exclusive Agency Agreement**

**Exhibit A.2.a: EA Independent Contractor Manual (October 18, 2012) on Agency Evaluation**

**Exhibit A.2.b: EA Independent Contractor Manual (October 1, 2019) on Agency Evaluation**

**Exhibit A.2.c: 2016 and 2017 Manual on ABO**

**Exhibit B.1: Termination Payment (TPP) Aug 2020 for Shao's Agency**

**Exhibit B.2: Business Metrics November 2018 for the Loss Ratio of Shao's Agency**

**Exhibit C.1: Shao's 1st Letter to Mr. Wilson**

**Exhibit C.2: Shao's 2nd Letter to Mr. Wilson**

**Exhibit C.3: Shao's 3rd Letter to Mr. Wilson**

**Exhibit C.4: Shao's 4th Letter to Mr. Wilson**

**Exhibit C.5: Shao's 5th Letter to Mr. Wilson**

**Exhibit D.1: Shao's 3/16/20 Email to Ms. Smith**

**Exhibit D.2: Ms. Smith's 8/21/19 Email on SEC Requirement**

**Exhibit E.1: Agent Jeff Shi's 11/1/15 Text Message on Agent Suzie Xu's Termination**

**Exhibit F.1: Ted Paris' 9/2/22 Answer to Agent Ron Grumley on TPP**

**Exhibit F.2: Ted Paris Expressed Sympathy for Shao Who had to Close His Office in May 2020**