IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PAUL SHAO,                               )
                                         )
        Plaintiff,                       )
                                         )
        v.                               )        Civil Action No. 1:23-cv-809 (RDA/WEF)
                                         )
ALLSTATE INSURANCE CO.,                  )
                                         )
        Defendant.                       )

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on the parties' cross-motions for summary judgment ("Motions") and Defendant Allstate Insurance Company's Motion for Sanctions.  Dkts. 158, 160, 203.  These matters have been fully briefed and are now ripe for disposition.  This Court has dispensed with oral argument as it would not aid in the decisional process.  *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J).  Considering the Motions together with the Memoranda in Support (Dkts. 162, 165, 204, 210), the Oppositions (Dkts. 183, 185, 193, 207, 211), and the Replies (Dkts. 194, 195, 208), this Court DENIES Plaintiff's Motion for Partial Summary Judgment, GRANTS Defendant's Motion for Summary Judgment, and DENIES Defendant's Motion for Sanctions for the reasons that follow.

## I.    PROCEDURAL BACKGROUND

On June 22, 2023, Defendant Allstate Insurance Company ("Defendant" or "Allstate") removed the complaint that *pro se* Plaintiff Paul Shao filed in Fairfax County Circuit Court.  Dkt. 1.  On June 29, 2023, Defendant filed its Answer.  Dkt. 6.  Plaintiff initially filed a Motion to Remand, which he subsequently withdrew.  Dkts. 4, 22.

On August 29, 2023, Plaintiff filed an Amended Complaint.  Dkt. 25.  In the Amended Complaint, Plaintiff asserted claims for: (i) failing to pay a termination payment, referred to as "TPP" (Count 1); (ii) failing to pay for and/or excluding a portion of Plaintiff's "book" of insurance policies from his TPP (Count 2); (iii) failing to provide a transitional time for Plaintiff after Defendant

terminated its Trusted Advisor program (Count 3); (iv) conversion (Count 4); (v) "intent to deceive," or perhaps fraudulent inducement (Count 5); (vi) failing to provide consideration (Count 6); (vii) breach of contract based on Plaintiff being inappropriately categorized as an independent contractor (Count 7); (viii) lack of due process (Counts 8, 10); (ix) discrimination (Counts 9, 12); (x) fraud (Count 11); and (xi) failing to comply with COVID-19 orders (Count 13). Defendant again answered and a scheduling order was issued. Dkts. 28, 29. Thereafter, the parties engaged in discovery, which involved a number of disputes that were resolved by U.S. Magistrate Judge William E. Fitzpatrick. In the midst of this process, Plaintiff appealed two of Judge Fitzpatrick's decisions directly to the Fourth Circuit. Dkt. 116. On March 4, 2024, Plaintiff amended his notice of appeal. Dkt. 130. On October 22, 2024, the Fourth Circuit dismissed the appeal. Dkt. 151.

On October 24, 2024, this Court set new deadlines for any motions for summary judgment. Dkt. 153. At Plaintiff's request and in deference to his *pro se* status, those deadlines were subsequently extended by two weeks. Dkt. 156.

On November 26, 2025, Plaintiff filed his Motion for Partial Summary Judgment. Dkt. 158. On November 27, 2025, Defendant filed its Motion for Summary Judgment. Dkt. 160. On December 2, 2024, this Court issued a *Roseboro* notice. Dkt. 167. Both parties later sought and received extensions of time. Dkts. 171, 178. On December 27, 2024, Defendant filed its Opposition to Plaintiff's Motion. Dkts. 183, 185. On January 13, 2025, Plaintiff filed his Opposition to Defendant's Motion. Dkt. 193.[1] On January 21, 2024, Defendant filed its Reply and, on January 24, 2025, Plaintiff filed his Reply. Dkts. 194, 195.

On February 10, 2025, Defendant filed a Motion for Sanctions. Dkt. 203. On February 11, 2025, Plaintiff filed his Opposition. Dkt. 207. On February 17, 2025, Defendant filed its Reply.

---

[1] That same day, Plaintiff filed a "Notice of Discrimination." Dkt. 192. Plaintiff essentially asserted that, by seeking to place certain documents under seal, Defendant has "singled out" Plaintiff for "unique treatment" which is "an act of discrimination." *Id.*

After briefing on the various motions was completed, Plaintiff filed a series of letters with the Court regarding certain medical issues that Plaintiff is experiencing.  Dkts. 212, 213, 214.

## II.     UNDISPUTED STATEMENT OF FACTS

Before analyzing the Motions at issue here, the Court must first determine the undisputed summary judgment record, as summary judgment is only appropriate where there are no genuine disputes of material fact.  The fact that the parties filed cross-motions for summary judgment does not generally relieve the Court of its obligation to determine whether there are disputes as to material facts which prevent the entry of judgment as a matter of law.  *Webster v. ACB Receivables Mgmt., Inc.*, 15 F. Supp. 3d 619, 625 (D. Md. 2014).

Here, Defendant has complied with the requirements of Federal Rule of Civil Procedure 56, the Local Rules, and the Rule 16(B) Scheduling Order by setting forth, in enumerated paragraphs with citations to the record, its undisputed statement of facts and by responding to Plaintiff's asserted "Facts."  Despite the instructions in the Rules, the Rule 16(B) Scheduling Order, and the Court's *Roseboro* Notice, Plaintiff has not complied with his obligations to either set forth affirmatively his statement of undisputed facts in his Motion or to respond in his Opposition brief in enumerated paragraphs with citations to the record.  Dkts. 34, 167.  On the whole, Plaintiff's assertions of "fact" are unsupported by record citations and frequently consist of argument or legal conclusions; thus they are  not properly considered "facts" for purposes of summary judgment.  The Court further notes that Plaintiff's filings are not made under penalty of perjury, nor do they contain an accompanying declaration whereby Plaintiff attempts to support the alleged "facts" that he asserts.  Moreover, as the Rules clearly set forth, where a party fails to properly address the moving party's assertion of fact, the Court may "consider the fact undisputed for purposes of the motion" or "grant summary judgment."

Fed. R. Civ. P. 56(e)(2)-(3).[2]  In deference to Plaintiff's *pro se* status, this Court has reviewed his filings and the record, in an attempt to determine which asserted undisputed facts may actually be in dispute; having done so, the Court determines that the following facts are undisputed:[3]

1.  Allstate provides insurance, including property and casualty insurance, and other financial products and services to individuals and businesses in the state of Virginia.

2.  In addition to providing these products and services directly to customers, Allstate appoints exclusive agents ("EAs"), through its Exclusive Agency program, to sell Allstate products.

3.  Before purchasing his interest in an Allstate book of business from Brett Elliott, Plaintiff examined the (a) pricing; (b) policy retention; (c) life production statistics; (d) quality of the policies; and (e) loss ratio for the book of business.  Plaintiff knew to examine these factors based on his experience in the insurance industry.

4.  Plaintiff received a loan from Allstate Finance Company LLC in the amount of $342,172.15 – which equals $250,000 plus interest – to purchase an interest in Elliott's Allstate Exclusive Agency book of business.

5.  Before EAs receive their appointments from Allstate, all EAs are required to first enter into an Allstate R3001 Exclusive Agency Agreement (the "EA Agreement") with Allstate, which sets forth the terms and conditions of the EA's relationship with Allstate.

6.  The EA Agreement between Plaintiff and Allstate became effective on August 1, 2015. Dkt. 165-2.[4]

---

[2] *See, e.g.*, *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (movant's statement of undisputed facts is properly deemed admitted where brief in opposition fails to "identify with any specificity which facts, if any, were disputed" (citing Local Civ. R. 56(B))); *Hayes v. Sotera Defense Solutions, Inc.*, 2016 WL 2827515, at *2 (E.D. Va. May 12, 2016) ("Any facts listed in the moving party's listing of material facts which are not specifically controverted in the non-moving party's statement of facts in opposition to the motion will be deemed to be admitted for purposes of [a] motion for summary judgment." (citing Local Civ. R. 56(B))); *Ferguson v. Holder*, 2015 WL 11117148, at *1 (E.D. Va. Feb. 9, 2015) (movant's statement of undisputed facts is "appropriately deemed admitted and governs th[e] [summary judgment] record" where non-movant fails to comply with Scheduling Order's provision regarding statement of facts); *Bon Supermarket & Deli v. United States*, 87 F. Supp. 2d 593, 600 (E.D. Va. 2000) (failure to file a timely response may properly be deemed as an admission to movant's statement of facts).

[3] The Court resolves attempted disputes regarding asserted facts in the related footnotes.

[4] Plaintiff attempts to dispute the asserted fact by noting that the EA Agreement was not signed by Allstate until August 5, 2015.  Dkt. 165-2 at 11.  Nonetheless, the particular provisions of the EA Agreement specifically provide: "Effective August 1, 2015, the Company appoints you as its agent to

7.   By signing the EA Agreement, Plaintiff agreed[5] to the following provision:

The Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency
Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards
("Agency Standards") as they may be amended from time to time, are expressly
incorporated in their entirety as part of this Agreement.  The Company reserves the
right to amend the Supplement, EA Manual, and Agency Standards at any time without
prior notice to you, except that notice regarding changes to commission amounts will
be given as indicated in Section XV.

8.   By signing the EA Agreement, Plaintiff "acknowledged that [he had] reviewed the
Supplement, EA Manual, and Agency Standards and that [he had] an ongoing
responsibility to review all changes . . . issued by the Company and agree[d] to be
bound by them."  Dkt. 165-2 at 11 ¶ XX(B).

9.   Plaintiff had access to the Supplement, the EA Manual, and the Agency Standards on
August 1, 2015, if not earlier.

10.  Plaintiff understood that he had to adhere to Defendant's rules and regulations and that
such conditions were "valid."

11.  By signing the EA Agreement, Plaintiff also agreed that he is "an independent
contractor for all purposes and not an employee" of Defendant.  Dkt. 165-2 at 1 ¶ 1(D);
Dkt. 165-6 at 13.

12.  To this end, Plaintiff agreed that he would "have full control of [his] time and the right
to exercise independent judgment as to the time, place, and manner of performing [his]
duties, which are defined in this Agreement and the incorporated Supplement, EA
Manual, and Agency Standards."  Dkt. 165-2 at 1 ¶ 1(D).

13.  The only areas over which Allstate maintains sole discretion relates to insurance forms;
insurance premiums, fees, and charges; the acceptance or rejection of applications; the
termination or modification of contracts; the limitation, restriction, or discontinuance
of the writing or selling of policies, coverages, lines, or kinds of insurance; Allstate's
licenses; and the type and quality of customer service.

---

represent the Company in the Exclusive Agency Program."  *Id.* at 2 ¶ I.A.  Moreover, Plaintiff's
Complaint asserts that he began operating under the EA Agreement on August 1, 2015.  Dkt. 25 ¶ 2.
In any event, Plaintiff does not dispute that the EA Agreement contains this provision but merely
asserts that it is a "Questionable Statement."  Dkt. 193 at 10-11.  Because Plaintiff's objection appears
immaterial and because the EA Agreement contains the date referred to by Defendant, Plaintiff has not
created a genuine issue of material fact in this regard.

[5] Plaintiff asserts that Defendant's use of the word "acknowledge" is "deceitful."  Dkt. 193 at
10.  Here, Defendant's asserted fact did refer to Plaintiff acknowledging the cited provision of the EA
Agreement.  Dkt. 165 at 2 ¶ 7.  The EA Agreement itself refers to Plaintiff and Defendant "agree[ing]."
Dkt. 165-2 at 2.  Accordingly, in this particular instance, the Court has substituted "agreed" for
"acknowledged."

14. By signing the EA Agreement, Plaintiff also agreed that:

The sole compensation to which [he] will be entitled for services rendered pursuant to th[e] Agreement will be the commissions set forth in the Supplement, as may be amended from time to time. [Defendant] will pay [his] commissions at the time and in the manner set forth in the Supplement. However, due to the inherent uncertainty of business conditions, [Defendant] reserves the right to increase or decrease any commission amounts and to change the commission rules.

Dkt. 165-2 at 8 ¶ XV(A).

15. Plaintiff also understood that the above provision meant that Defendant reserved the right to increase or decrease any commission amounts and to change the commission rules.

16. By signing the EA Agreement, Plaintiff further agreed that:

Th[e] Agreement may not be modified except by a written agreement between [Defendant] and [Plaintiff] which expressly states that it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of [Defendant] will have the authority to modify this Agreement.

Dkt. 165-2 at 10 ¶ XX(A).

17. Plaintiff also agreed that the "authority granted to [him] under this Agreement is nonexclusive" and that the term "exclusive" is used to "refer[] to the obligations assumed by [him] under Section I.E." *Id.* at 11 ¶ XX(E). In other words, EAs exclusively sell Defendant's products; they cannot sell insurance products from insurance carriers other than Defendant, except in limited circumstances.

18. By signing the EA Agreement, Plaintiff "acknowledge[d] that [he had] read this Allstate R3001S Exclusive Agency Agreement, underst[ood] it, and agree[d] to be bound by its terms." Dkt. 165-2 at 11.[6]

19. Allstate EAs, like Plaintiff, must meet Allstate Business Objectives ("ABOs") in order to maintain their EA Agreement and status as an Exclusive Allstate Agent. The ABOs are referenced in the EA Manual, which is incorporated into the EA Agreement.[7]

---

[6] Here again, Plaintiff objects to the use of the word "acknowledged." Dkt. 193 at 10. But that is the exact language used in the EA Agreement. Plaintiff otherwise merely raises legal arguments with respect to this paragraph, which are not appropriately considered when determining whether certain factual statements are undisputed. Accordingly, there is no genuine dispute of material fact.

[7] Plaintiff has asserted, without citation to record evidence, that "ABO[s] are not mentioned in the EA Agreement." Dkt. 158 at 10. In this regard Plaintiff is partially correct, the EA Agreement incorporates the EA Manual, which sets forth the ABO program. Dkt. 165-2 at ¶ II(B); Dkt. 165-6. Thus, although not specifically set forth in the EA Agreement, the ABO program is incorporated by

20. Plaintiff understood that Defendant's ABOs existed as early as 2015, but he did not look at them until approximately January 2018 when Allstate sent an email about them.[8]

21. If EAs do not meet the ABOs, which provide feedback on their business results, then their EA Agreement is subject to termination.[9]

22. Plaintiff failed to meet his ABOs at least eight times between April 2019 and December 2019.

23. In 2020, Defendant exercised its right under Section XVII.B of the EA Agreement and terminated Plaintiff's EA status effective May 30, 2020, due to Plaintiff's failure to meet Defendant's ABOs.[10]  Plaintiff was informed of this termination on or around February 10, 2020.

---

reference into that contract through its incorporation of the EA Manual.  The asserted fact is modified to more accurately state how the EA Agreement and the ABO program relate to one another.

[8] Defendant's asserted fact is that Plaintiff knew the ABOs existed as early as 2012-2013 but did not look at them until January 2018.  Dkt. 165 at 5 ¶ 20.  Plaintiff responds: (i) that he incorrectly said 2018 instead of 2019 in his deposition testimony; and (ii) the "other two references are bogus."  Dkt. 193 at 11.  Plaintiff's unsworn assertion in his Opposition is insufficient to contradict his sworn deposition testimony.  The Court agrees that Defendant's citations to other portions of the record are unhelpful in supporting the asserted fact.  However, the Court examined Plaintiff's deposition testimony.  The deposition testimony supports that: (i) Plaintiff had access to the ABOs on the Gateway platform on or hear the time that the EA Agreement was executed in August 2015; and (ii) Plaintiff did not look at the ABOs until January of 2018.  Dkt. 165-3 at 45:9-48:3.  Plaintiff is correct that his deposition testimony does not support that he knew of or had access to the ABOs in 2012 or 2013.  Rather, the deposition testimony supports that, after the fact in 2018, Plaintiff would look for the "2012 supplement."  *Id.*  Accordingly, the asserted fact has been modified, but there is no genuine dispute of material fact.

[9] In his Motion, Plaintiff asserted, without citation, that: "Allstate employed the production quota . . . ABO . . . to terminate agents for failing to meet the ABO quota."  Dkt. 158 at 9 ¶ 40(i).  Defendant admits that, failure to meet ABOs could be a basis for termination, and asserted a similar fact, set forth above, in its own Statement of Undisputed Facts.  Dkt. 185 at 2.  Defendant denies, however, that there was a "production quota."  *Id.*  Accordingly, Plaintiff's asserted fact is partially disputed, as he cites no evidence in support of his assertion regarding production quotas.

[10] Plaintiff asserts that: "Allstate had never initialed a change or modification of the EA Agreement with a written agreement between Allstate and its agents on replacing the original Business Objectives (BO) with ABO.  Therefore, the employment of ABO quota by Allstate to terminate agents is a breach of the contract."  Dkt. 156 at 10 ¶ 40(iv).  Plaintiff's assertion is unsupported by citation to the record and is pure legal argument.  As discussed *supra*, it also does not accurately describe the interaction between the EA Agreement and the incorporated EA Manual.  Accordingly, Plaintiff has failed to appropriately set forth an undisputed fact.

24. The EA Agreement provides that an EA has "an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in [his or her] Allstate customer accounts developed under this Agreement." Dkt. 165-2 at 8 ¶ XVI(B).

25. The EA Manual defines Plaintiff's economic interest in his book of business as a "specifically defined, limited interest. . . . which is comprised of only two elements:

> First, the economic interest includes the option, where applicable of receiving a termination payment according to the terms of your R3001 Agreement, this Manual, and the Supplement[; and]

> Second, the economic interest includes the ability to transfer your interest as provided in the R3001 Agreement this Manual, and the Supplement, subject to the Company's approval.

No other rights are included with the terms 'your economic interest' or 'economic interest in the book of business.' You do not have any ownership interest in any of the business written under the R3000 and R3001 Agreements or any previous agency agreement . . . ." Dkt. 165-6 at 33.[11]

26. Following termination of the EA Agreement, Plaintiff was provided with 90 days to sell his economic interest in his book of business to a purchaser approved by Defendant.

27. On May 15, 2020, Defendant granted Plaintiff an extension of the deadline to transfer his economic interest to a potential buyer, Catherine Lee, from May 31, 2020, to August 31, 2020.

28. On June 3, 2020, Plaintiff informed Defendant that he had "made an agreement with the landlord to vacate [his Allstate Agency location]" and confirmed that he had moved out of the location.

29. Ms. Lee was unable to purchase Plaintiff's book of business because she never cleared the Allstate Financial Services background check.

30. Although Plaintiff attempted to find a buyer for his agency or economic interest in his book of business, the potential buyers were either not approved by Defendant or ultimately were unable to purchase it.

31. If an EA, like Plaintiff, fails to or chooses not to sell his economic interest in his book of business within the 90-day period, the EA may elect to receive a termination payment or TPP from Defendant.

---

[11] Plaintiff's assertions regarding his economic interest in the book of business are unsupported by any citation to the record and are contrary to the EA Agreement, which incorporates the EA Manual. Accordingly, Plaintiff's purported factual assertions regarding his economic interest (Dkt. 158 at 13-14) are not properly considered on summary judgment.

32. The TPP is calculated and paid in accordance with the Supplement, which specifies which categories of business are included in the TPP and how to calculate the payment. Dkt. 165-1 at 94-97.

33. Specifically, the Supplement provides that the TPP for auto, property, commercial, and Allstate Financial renewals are calculated using a multiplier of 1.5. Dkt. 165-1 at 96.

34. The Supplement also provides that "[b]usiness underwritten under any prior Allstate employee agent agreement" is excluded from the TPP calculation.

35. The TPP may also "include a deduction for any indebtedness owed to [Defendant]."

36. The 2020 Supplement also states that "[t]he payment of the Termination Payment will be made in 24 monthly installments."

37. Plaintiff was paid a total of $129,973.21 as his TPP. His TPP was calculated and paid out between October 2020 and September 2022.[12]

38. Plaintiff has no written evidence that anyone at Defendant stated that they would modify or amend his EA Agreement and buy back his book of business outside of the TPP provisions or for an amount more than the TPP.[13]

39. Before filing his complaints in this action, Plaintiff did not file a complaint with Virginia's Fair Employment Practices Agency ("FEPA") or the Equal Employment Opportunity Commission ("EEOC"). Accordingly, those entities did not investigate Plaintiff's claims of discrimination.

### III.    LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

---

[12] Plaintiff asserts that this TPP excluded $392,736.52, "because this portion of the book was written by employee salespersons of Allstate." Dkt. 158 at 12. Plaintiff fails to cite any portion of the record to support any of the facts that he purports to put forth. Accordingly, these "facts" are not properly considered on summary judgment.

[13] Plaintiff asserts, without citation to the record, that Allstate "would use the phrase 'buyback with the multiple 1.5'" to potential agent-candidates and that such statements created a "false impression" regarding the TPP. Dkt. 158 at 11 ¶ 41. Plaintiff's asserted fact is unsupported by any citation to the record and disputed by Defendant; accordingly, it is not properly considered as a "fact" for purposes of summary judgment. Dkt. 185 at 5. In any event, such allegations appear immaterial where Plaintiff has not asserted that _he_ was told such information and where such conversations occurred _before_ an EA signed the EA Agreement, which incorporates the Supplement and sets forth the TPP calculation. Similarly, Plaintiff's assertions about what is customary in the "marketplace" may or may not be accurate factual statements (unsupported by any citation to the record), but they are irrelevant to the extent that they contradict the EA Agreement signed by Plaintiff.

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The party seeking summary judgment has the initial burden to show the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255.  "(A) party opposing summary judgment may not simply rest on the allegations of his complaint but must instead come forward with specific evidence showing the existence of a genuine issue of fact."  *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

The standard of review does not change when ruling on cross-motions for summary judgment.  *E.I. DuPont De Nemours & Co. v. Ampthill Rayon Workers, Inc.*, 516 F. Supp. 2d 588, 593 (E.D. Va. 2007).  When faced with cross-motions for summary judgment, a court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotations omitted).

IV.    ANALYSIS

Both parties have filed motions for summary judgment.  Defendant seeks judgment in its favor as to the entirety of Plaintiff's Complaint, whereas Plaintiff seeks judgment in his favor as to only some of the counts in his Amended Complaint.  The Court groups counts together and addresses each group in turn as appropriate.

A.    Breach of Contract Claims

Counts 1, 2, and 3 are essentially breach of contract claims.  *See* Dkt. 25 at 39-40 (Count 1 asserting "Failure to Pay Full TPP Amount"); *id.* at 41-43 (Count 2 asserting "Failure to Pay the Portion of the Book, Written by Employee Salespersons"); *id.* at 43-44 (Count 3 asserting "Failure to Provide a Transitional Time").  As this Court has previously recognized, under Virginia law, a plaintiff must show: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant['s] violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of the obligation."  *Empower AI, Inc. v. Dillahay*, 2024 WL 4351437, at *5 (E.D. Va. Sept. 30, 2024).

Plaintiff does not cite any provision of the EA Agreement that Defendant has breached. And, indeed, he cannot, because the EA Agreement provides that his "economic interest [is] defined in this Agreement and the incorporated Supplement and EA Manual."  Dkt. 165-2 at 8 ¶ XVI(B).  The incorporated Supplements provide for the calculation of the TPP of which Plaintiff now complains. Dkt. 165-1 at 94-97 (2016 Supplement explaining the calculation of the TPP); Dkt. 165-11 at 21-30 (2020 Supplement explaining the calculation of the TPP).  Rather than point to a specific contractual provision, Plaintiff makes arguments regarding a "standard buyout" and "customary practice."  Dkt. 158.  But it is the parties' EA Agreement and incorporated, related documents that governs this dispute. *See L. Foster Consulting, LLC v. XL Grp., Inc.*, 2012 WL 2785904, at *9 (E.D. Va. June 1, 2012) (recommending judgment on the pleadings where "[n]either of these first two alleged breaches finds any support within the four corners of the Agreement").  At this stage of the litigation, Plaintiff must do more to succeed on his own Motion or to defeat Defendant's Motion.  Plaintiff's failure to identify any provision of the contract that Defendant is alleged to have breached would make his argument insufficient even at the motion to dismiss stage.  *Georgian v. Bank of Am., N.A.*, 2025 WL 2388779, at *7 (W.D.N.C. Aug. 18, 2025) (collecting cases regarding federal pleading standards for a breach of contract claim) ("In pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue.").  Thus, Plaintiff has failed to point to any record evidence that would create a genuine issue of material fact with respect to his claims in Counts 1, 2, and 3.  Because Plaintiff cannot demonstrate that any reasonable juror could find that Defendant breached the EA Agreement, summary judgment is appropriate in favor Defendant on those Counts.

Seeking to avoid this conclusion, Plaintiff makes references to "adhesive" (which in context must be a reference to a contract of "adhesion") and "unconscionable" contracts.  Dkt. 193 at ¶¶ 5-6, 9-11, 28, 82-87.  As courts recognize, such arguments cannot be raised for the first time in opposition to a motion for summary judgment.  *See Gallagher v. Holt*, 2012 WL 3205175, at *12 n.12 (E.D. Cal. Aug. 3, 2012) (holding that parties "may not raise new grounds for relief in a responsive brief" where

the reply "present[ed] a new ground for relief" and asking the court to "refuse to enforce [the] contract" where it is "unconscionable"); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 847 F. Supp. 2d 843, 851 n.9 (E.D. Va. 2012) (recognizing the same principle more generally).   Moreover, as even Plaintiff recognizes, the fact that he lacked bargaining power does not make the EA Agreement unenforceable.  *See* Dkt. 193 at 4 (conceding that "[t]hese contracts are often enforceable").  In this regard, Plaintiff is correct, as "courts in the Eastern District of Virginia regularly enforce contracts of adhesion." *McLean v. Branch Banking & Trust Co.*, 2020 WL 4547818, at *2 (E.D. Va. Aug. 5, 2020) (collecting cases).  And, in Virginia, a contract is not *per se* unconscionable merely because it is a standard form contract "between two parties of admittedly unequal bargaining power." *Saturn Distrib. Corp. v. Williams*, 905 F.3d 719, 725-26 (4th Cir. 1990).  Here, Plaintiff presents no evidence from which a reasonable juror could determine that the EA Agreement was unconscionable.  Thus, there is no genuine issue of material fact and summary judgment in favor of Defendant is appropriate.

Further, to the extent that Plaintiff argues that he did not review the EA Manual or Supplement until 2018, such argument is unavailing.  Dkt. 193 at 12 (asserting that "the Supplement was intentionally or by design not made known to Shao at the signing of the contract").  But the EA Agreement that Plaintiff signed, specifically provides that Plaintiff "acknowledged that [he had] reviewed the Supplement, EA Manual, and Agency Standards." Dkt. 165-2 at 11 ¶ XX(B).  As has been previously noted in this District, "Virginia courts are not sympathetic to parties who do not read contracts before signing them."  *Johnson v. Opportunity Financial, LLC*, 2023 WL 2636712, at *10 (E.D. Va. Mar. 24, 2023).  That is particularly true here, where Plaintiff sold insurance policies.  *See Denver Global Prods., Inc. v. Leon*, 815 F. App'x 714, 718 (4th Cir. 2020) (noting that plaintiff was a "sophisticated businessman" who made an "improvident contract").  Additionally, Plaintiff's attempt to excuse his signing of the EA Agreement as the product of duress falls well short, because Plaintiff cannot establish that he was forced to sign the EA Agreement and, allegations of duress must be made promptly upon the removal of the duress.  *See Shepherd v. Shepherd*, 69 Va. Cir. 403, at *4 (Va. Cir.

12

Ct. Dec. 28, 2005).  As Virginia courts recognize, "[c]ourts cannot relieve one of the consequences of a contract merely because it was unwise."  *Pelfrey v. Pelfrey*, 25 Va. App. 239, 245 (1997). Accordingly, this argument also fails and summary judgment in favor of Defendant is appropriate.[14]

### B.    Conversion and Fraud Claims

In Count 4, Plaintiff asserts a claim of conversion and Counts 5, 6, and 11 are essentially fraud claims.[15]  In this regard, Plaintiff attempts to repackage his breach of contract claims relating to the TPP as conversion and fraud claims.  These claims fare no better.

With respect to conversion, Plaintiff must show "the wrongful assumption or exercise of the right of ownership over goods or chattels."  *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 808 n.10 (E.D. Va. 2017).  But Defendant's actions were not wrongful where they were pursuant to the EA Agreement, EA Manual, and Supplements to which Plaintiff had agreed.  Dkt. 165-2 at 11 ¶ XX(B); *cf. Heredia v. Intuitive Surgical, Inc.*, 2018 WL 2021914, at *4 (N.D. Cal. May 1, 2018) (finding no conversion where "DeLeC Uruguay received Dr. Heredia's payments pursuant to contract and not through any wrongful act").  Moreover, to support a conversion claim, a plaintiff's "right" to property must be a "clear, definite, undisputed, and obvious property right in a thing to which they are entitled to immediate possession."  *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 306 (1994). Plaintiff cannot meet that burden here, where his right was qualified and subject to the provisions of the EA Manual, which states that his economic interest is a "specifically defined, limited interest" that consists of only the ability to receive a TPP (as defined by the Supplement) or to transfer the interest

---

[14] Other federal courts have similarly granted summary judgment where EAs sought to allege breaches of the EA Agreement based on their economic interest in their book of business or the TPP. *See, e.g.*, *Rudolph v. Allstate Ins. Co.*, 2020 WL 4530600, at *5 (S.D. Ohio Aug. 6, 2020) ("There is no opportunistic advantage where an express, bargained-for term affords one party the right to take specific action.").

[15] Although Plaintiff originally framed Count 6 as an adequacy of consideration (Dkt. 25 at 49), Plaintiff now frames Count 6 as "contract fraud."  Dkt. 158 at 14.

to an approved buyer. Dkt. 165-6 at 33. Because Plaintiff has not demonstrated any facts from which a reasonable juror could find conversion, summary judgment in favor of Defendant on Count 4 is appropriate.

The contours of Plaintiff's various fraud claims in Counts 5, 6, and 11 are not entirely clear, but essentially Plaintiff asserts that the EA Agreement was unsupported by consideration and that the EA Agreement is deceptive because Defendant is not bound to exclusively use EAs to sell its products. Both of these claims are unsupported by the record. With respect to the consideration contained within the EA Agreement, Plaintiff appears to misunderstand the legal meaning of consideration. As Defendant correctly sets forth, consideration is "the price bargained for and paid for a promise. It may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made." *Smith v. Mountjoy*, 280 Va. 46, 53 (2010) (internal quotations omitted). Here, in exchange for his agreement to the terms of the EA Agreement, Plaintiff was authorized to sell Defendant's products using Defendant's name in return for certain commissions. Dkt. 165-2 at 2 ¶ I(A) (describing authority to sell products); *id.* at 8 ¶ XV(A) (describing compensation). To the extent that Plaintiff argues that the EA Agreement lacks consideration because the parties were not equally bound with respect to the exclusivity provisions, Plaintiff is incorrect. *See Bailey v. Turnbow*, 273 Va. 262, 267 (2007) ("A court of equity will not set aside a contract because it is 'rash, improvident, or [a] hard bargain.'"). To the extent Plaintiff argues that there was "intent to deceive" because the EA Agreement is not "exclusive" with respect to Defendant, Plaintiff's claim is defeated by the plain language of the contract which provides: "The authority granted to you under this Agreement is nonexclusive. The term 'Exclusive' as used in the title of this Agreement refers to the obligations *assumed by you*." Dkt. 165-2 ¶ XX(E) (emphasis added). Thus, there are no genuine disputes of material fact and no reasonable juror could find in favor of Plaintiff on his claims of fraud.

Plaintiff's filings make some reference to "Allstate recruiters" using the phrase "buyback with the multiple of 1.5" by creating a "false impression that Allstate would buyout an agent's economic

interest . . . by paying the multiple of 1.5 in the universal formula in evaluating the value of the book." Dkt. 158. To begin with, such assertions are unsupported by citation to any portion of the record. Moreover, Plaintiff fails to assert that _he_ heard Defendant's agents explain the TPP in such terms. Additionally, it is unclear to the Court that such statements are misrepresentations where the TPP does use a 1.5 multiplier and where Plaintiff does not allege that such recruiters actually referred to any universal formula. Dkt. 165-1 at 96. Plaintiff's claim also fails to assert the necessary "who, what, where, when, and why" necessary to support a fraud claim. _U.S. ex rel. DeCesare v. Americare In Home Nursing_, 757 F. Supp. 2d 573, 582 (E.D. Va. 2010). Finally, to the extent Plaintiff attempts to ground his claims in the covenant of good faith and fair dealing, those claims are subsumed into his breach of contract claims and cannot be stated as standalone claims. _See Rogers v. Deane_, 992 F. Supp. 2d 621, 633 (E.D. Va.) ("Where there is a claim for breach of contract, the inclusion of a claim for breach of the implied warranty of good faith and fair dealing as a separate claim is duplicative of the breach of contract claim . . . ."), _aff'd_, 594 F. App'x 768 (4th Cir. 2014).

In sum, the Court will grant Defendant's Motion with respect to Counts 4, 5, 6, and 11.[16]

### C.    Claims Based on Protections for Employees

In Counts 7 and 12, Plaintiff claims to be an employee and seeks the protection such status provides. Plaintiff first seeks to be declared an employee of Defendant and then seeks to state claims under various state and federal antidiscrimination statutes. Dkt. 25 at 50, 55. The EA Agreement clearly provides that Plaintiff was an independent contractor and, thus, both of these claims fail.

The EA Agreement specifically states that Plaintiff is "an independent contractor for all purposes and not an employee." Dkt. 165-2 at 1 ¶ I(D). To that end, Plaintiff agreed that he would

---

[16] Plaintiff only moved for summary judgment with respect to Counts 1-6. Dkt. 158 at 9. Having now determined that Defendant is entitled to summary judgment with respect to each of those Counts and that Plaintiff has raised no genuine issues of material fact, Plaintiff's Motion for Partial Summary Judgment will be denied.

"have full control of [his] time and the right to exercise independent judgment as to the time, place, and manner of performing [his] duties, which are defined in this Agreement and the incorporated Supplement, EA Manual, and Agency Standards." *Id.* Plaintiff's briefs fail to address or to assert any facts regarding why he should be considered an employee rather than an independent contractor. Indeed, Plaintiff himself refers to how "Allstate converted its agents to an independent contractor of EA." Dkt. 193 at 23. Thus, Plaintiff has failed to raise any genuine disputes of material fact with respect to this alleged claim.

Moreover, applying the test established by the Fourth Circuit for determining whether an individual is an employee or independent, Plaintiff is clearly an independent contractor. *See Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256 (4th Cir. 1997) (identifying the following factors: the skill required, the source of the instrumentalities and tools, the location of the work, the duration of the relationship, whether the hiring party has the right to assign additional projects, the extent of the hired party's discretion, the hired party's role in hiring/paying assistants, whether the work is part of the regular business of the hiring party, the provision of employee benefits, and the tax treatment of the hired party). The Court first notes that there is some level of skill involved in selling insurance, because, in Virginia, such agency requires becoming licensed. *See* Virginia Code § 38.2-1822(A); *see Schweiher v. Farm Bureau Ins. Co.*, 207 F.3d 480, 485 (8th Cir. 2000) (factor weight in favor of independent contractor status, where licensed by state). The EA Agreement also provides that Plaintiff was responsible for the location of his work and the associated expenses. Dkt. 165-2 at 6 ¶ VIII ("You will be responsible for the payment of all expenses that you incur . . . including . . . expenses for your sales location, supplies not furnished by the Company, compensation of your employees . . . , telephone, postage, and advertising expenses incurred at your direction, and all other charges and expenses."). The EA Agreement further provided that Plaintiff could hire his own employees "entirely in [his] own discretion." *Id.* at 3 ¶ II(E). Thus, these factors each weigh in favor of Plaintiff's independent contractor status. Moreover, other federal courts have similarly held that EAs are

independent contractors. *See, e.g.*, *Chai v. Allstate Ins. Co.*, 2005 WL 6778901, at * (S.D. Ohio Apr. 28, 2005) ("Examining these factors as a whole, the Court holds that the evidence that Chai is an independent contractor is so overwhelming that no reasonable jury could hold otherwise."). Accordingly, to the extent Count 7 attempts to assert a claim based on Plaintiff's status as an "employee," Defendant is entitled to summary judgment.

Plaintiff's independent contractor status is also determinative of his claims in Count 12. In Count 12, Plaintiff seeks to assert claims under various antidiscrimination statutes. But those statutes only protect employees. *See Derthick Assocs., Inc. v. Bassett-Walker, Inc.*, 1997 WL 56908, at *2 (4th Cir. Feb. 12, 1997) ("An examination of the record confirms that the district court was correct in determining that Derthick and Robbins were independent contractors and that, therefore, they were not entitled to bring an ADEA claim."); *Green v. Centech Grp.*, 2016 WL 9211755, at *3 (E.D. Va. Aug. 25, 2016) ("Title VII protects only employees, and not independent contractors"). As this Court has previously noted, the Virginia Human Rights Act (the "VHRA") uses substantially the same language as Title VII and thus such statutes are typically analyzed together. *See, e.g.*, *Cox v. Red Hat, Inc.*, 2025 WL 889888, at *12 n.14 (E.D. Va. Mar. 21, 2025). Accordingly, applying the same principles to the VHRA claim, Plaintiff's VHRA claim fails due to his independent contractor status.

Plaintiff's discrimination claims also fail for the separate reason that he has failed to assert any facts suggesting that he has exhausted his claims. Each of the statutes upon which he relies requires that a plaintiff exhaust before he initiates a claim in court. *See Hairston v. Nilit America, Inc.*, 2023 WL 8011089, at *3 (W.D. Va. Nov. 20, 2023) (noting that the VHRA and Title VII require administrative exhaustion); *Harris v. Am. Airlines*, 2017 WL 2880400, at *1 (W.D.N.C. July 6, 2017) (recognizing that Title VII and the ADEA require administrative exhaustion). Neither Plaintiff's briefs on summary judgment nor his Amended Complaint refer to any attempt to exhaust Plaintiff's claims before instituting this litigation. Accordingly, Plaintiff's discrimination claims also fail for this reason as well and Defendant is entitled to summary judgment on Counts 7 and 12.

D.     Plaintiff's "Removed" Claims and Claims Lacking a Cause of Action

In his Motion, Plaintiff asserted that he was "removing" Counts 8 and 10.[17]  The Court construes this as essentially a motion for voluntary dismissal.  At this late stage of the litigation, voluntary dismissal is inappropriate.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 232, 235 (E.D. Va. 2017) (recognizing that "the Fourth Circuit has found 'on multiple occasions that a district court does not abuse its discretion in denying a motion for voluntary dismissal if the case has advanced to the summary judgment stage and the parties have incurred substantial costs in discovery'" (internal citations omitted)).  In his Motion, Plaintiff concedes that Count 8 "deals with the denial of due process" and that he has now come "to realize that Allstate, as a private sector business entity, is not required to observe due process."  Dkt. 158 at 4.  Moreover, it is well-settled that due process protections only protect against state actors.  *See, e.g.*, *Fleming v. Workers' Compensation Comm'n of Com. of Va.*, 878 F. Supp. 852, 869 (E.D. Va. 1995) ("The requirements of the due process clause do not apply 'to acts of private persons or entities.'").  Similarly, Plaintiff recognizes that the same that could be said of Count 8 "can be said of the [tenth] cause of action . . . which describes Allstate as a police state."  Dkt. 158 at 5.[18]  Accordingly, because Defendant is not a state actor, there are no genuine disputes of material fact as to Counts 8 and 10 and summary judgment in favor of Defendant is appropriate and will be granted.

---

[17] Plaintiff refers to the "seventh" cause of action, but describes it as asserting a "denial of due process in Allstate's administrative disciplinary operation."  Dkt. 158 at 4.  The count that refers to the "administrative disciplinary operation" is, however, Count 8 rather than Count 7.  Dkt. 25 at 10.  Thus, the Court assumes that this was an error.  Similarly, Plaintiff refers to the "ninth" cause of action, but states that it "describes Allstate as a police state."  Dkt. 158 at 5.  Again, this appears to be an error as Count 10 is the count that refers to Defendant having the "trait of a police state."  Dkt. 25 at 53.  The Court will construe all references to Count 7 as referring to Count 8 and all references to Count 9 as referring to Count 10.

[18] Plaintiff also describes Count 10 as "merging into the eleventh cause of action on discrimination."  Dkt. 158 at 5.  To the extent Count 10 is intended to state a discrimination claim, summary judgment in favor of Defendant for the same reasons previously discussed with respect to Count 11.

Count 9 attempts to assert a similar claim to Counts 8 and 10 in that it asserts that Defendant has failed to apply the "rule of law . . . evenly or equitably in the realm of Allstate disciplining its members." Dkt. 25 at 51.[19]  To the extent this again attempts to state any sort of claim based on Plaintiff's constitutional rights, the claim fails for lack of state action.  Moreover, what particular relief Plaintiff seeks and the contours of this cause of action are unclear.  For all of these reasons, Plaintiff has failed to demonstrate that there is a genuine dispute of material fact or that a reasonable juror could rule in his favor on this count.  Accordingly, summary judgment will enter in favor of Defendant on Count 9.

Finally, in Count 13, Plaintiff asserts that "Allstate put Shao in harms' way by failing to comply" with COVID-19 stay-at-home orders, when it denied his request for a termination extension. Dkt. 25 at 56.  Plaintiff fails to assert any facts or establish any genuine issue of material fact that _Defendant_ forced Plaintiff to violate any stay-at-home orders.  Indeed, Plaintiff asserts in his Amended Complaint that he was meeting with "his landlord, the cleaners, the technicians, and the movers." _Id._ Although those meetings might flow from Defendant's termination of his EA status, Plaintiff does not assert that they were required by Defendant.  Moreover, Plaintiff fails to identify any authority that provides him with a private cause of action to enforce either the White House's declaration or former Virginia Governor Ralph Northam's Stay-at-Home Order.  To the extent that Plaintiff seeks to enforce the White House's declaration, "private rights of action to enforce federal law must be created by Congress." _Alexander v. Sandoval_, 532 U.S. 276, 286-87 (2001).  Moreover, federal courts have similarly recognized that a governor's order is not privately enforceable. _See, e.g._, _Bowes-Northern v. Patel_, 2025 WL 415756, at *4 (N.D. Ind. Feb. 6, 2025) (finding no private cause of action).  Plaintiff points to no provision of Virginia law that would provide him with a private cause of action to sue to

---

[19] The Court also notes that the conduct alleged in the Amended Complaint related to this Count occurred in November 2015 and is likely beyond any relevant statute of limitations.  However, because Defendant does not rely on a statute of limitations defense, the Court does not decide that issue here.

enforce the Stay-at-Home Order.  Accordingly, summary judgment in favor of Defendant on Count 13 is appropriate.

*    *    *

In sum, Defendant is entitled to summary judgment on each of the counts of the Amended Complaint because no reasonable juror could find in Plaintiff's favor and because there are no genuine disputes of material fact.  For the same reasons, Plaintiff's Motion for Partial Summary Judgment will be denied.

E.    Motion for Sanctions

Defendant has also filed a Motion for Sanctions.  Dkt. 203.  Defendant has twice previously moved for sanctions and been denied by U.S. Magistrate Judge Fitzpatrick.  Dkts. 124, 132.  In so ruling, Judge Fitzpatrick cautioned Plaintiff, on March 1, 2024, that Plaintiff was "getting close" to sanctionable conduct.  Dkt. 144 at 20:19-24.  Defendant appears to hinge its new Motion on Plaintiff's filing of a "Notice of Discrimination" (Dkt. 192), to which Defendant does not appear to have filed any response.  Dkt. 204 at 1 (arguing that the Notice of Discrimination is "yet another frivolous pleading").

As Defendant recognizes, "[f]ederal courts possess certain inherent powers, not conferred by rule or statute . . . . includ[ing] the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017). The Court must consider the entire case when determining the appropriate sanction. *Grethen v. Clarke*, 2015 WL 13387681, at *4 (E.D. Va. Nov. 24, 2015), *aff'd*, 672 F. App'x 300 (4th Cir. 2017).  Available sanctions include orders of dismissal and assessment of attorneys' fees. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991).  To support an award of attorneys' fees, the Court must find that bad faith or abuse of judicial process exists. *Hensley v. Alcon Lab'ys, Inc.*, 277 F.3d 535, 543 (4th Cir. 2002).  In evaluating whether a party has engaged in bad faith conduct, courts should consider a party's conduct in the

20

litigation. *KitBar Enterprises, LLC v. Liberty Ins. Underwriters, Inc.*, 297 F. Supp. 3d 614, 617 (E.D. Va. 2018) (quoting *Stradtman v. Republic Services, Inc.*, 121 F. Supp. 3d 578, 581 (E.D. Va. 2015)).

The Court notes that Defendant did not appeal Judge Fitzpatrick's determination that sanctions were not appropriate and, thus, the only new information to be considered by this Court on which Defendant relies is Plaintiff's Notice of Discrimination. The Notice of Discrimination essentially purports to address Defendant's choices with respect to sealing and redactions, in particular with respect to Exhibit 2 (the EA Agreement) and accuses Defendant of singling him out for "unique treatment." Dkt. 192. Although this is certainly not a filing contemplated by the Federal Rules of Civil Procedure, the Court notes that Judge Fitzpatrick agreed with Plaintiff that the EA Agreement should not be under seal. Dkt. 209 (ordering that "the complete, unredacted version of exhibits 2 . . . be unsealed"). Accordingly, the Court has difficulty describing this filing as entirely abusive.

Defendant's Motion also rests on the alleged frivolous nature of Plaintiff's claims. To begin with, the Court notes that those matters were already before Judge Fitzpatrick at the time he declined to sanction Plaintiff. But the Court further notes that Defendant elected not to file a motion to dismiss the Amended Complaint. Ordinarily, motions to dismiss are intended to screen out frivolous claims to ensure that parties do not spend time and money in discovery on claims that are ultimately meritless. Here, where Defendant declined to narrow the case in the most efficient way possible, the Court is disinclined to penalize a *pro se* Plaintiff for zealously pursuing such claims.

Ultimately, whether to award sanctions is a matter of discretion. Here, considering Plaintiff's *pro se* status, Defendant's choice to proceed to discovery without eliminating any frivolous claims, and Judge Fitzpatrick's prior decisions on Defendant's Motion for Sanctions, the Court will exercise its discretion to decline to award attorneys' fees as a sanction. Although Plaintiff has pursued some frivolous claims, it is not clear to the Court that Plaintiff acted in bad faith. Accordingly, the Motion for Sanctions will be denied.

V.    CONCLUSION

In sum, because there are no genuine disputes of material fact and because no reasonable juror could find in favor of Plaintiff, summary judgment in favor of Defendant is appropriate. Despite the nature of the claims at issue and the Court's decision on summary judgment, the Court declines to exercise its discretion to award sanctions to Defendant.

Accordingly, it is hereby ORDERED that Plaintiff's Motion for Partial Summary Judgment (Dkt. 158) is DENIED; and it is

FURTHER ORDERED that Defendant's Motion for Summary Judgment (Dkt. 160) is GRANTED; and it is

FURTHER ORDERED that Defendant's Motion for Sanctions (Dkt. 203) is DENIED; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to enter Rule 58 judgment on behalf of Defendant and against Plaintiff on all Counts of the Amended Complaint (Dkt. 25).

To appeal this Court's decision, Plaintiff must file a written notice of appeal with the Clerk of Court within 30 days of the date of entry of this Memorandum Opinion and Order. A notice of appeal is a short statement indicating a desire to appeal, including the date of the order that Plaintiff wants to appeal. Plaintiff need not explain the grounds for appeal until so directed by the court of appeals. Failure to file a timely notice of appeal waives Plaintiff's right to appeal this decision.

IT IS SO ORDERED.

Alexandria, Virginia
September 25, 2025

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge